**BRIDGEWAY CORPORATION,**
**Plaintiff,**

v.

**CITIBANK d/b/a Citicorp,**
**N.A., Defendant.**

**No. 97 Civ. 8884 DC.**

United States District Court,
S.D. New York.

March 30, 1999.

---

**5.** This assumes that S.Z. has paid its counsel for their services.

Amon & Sabatini by Michael J. Calvey, New York City, for plaintiff.

Petra T. Tasheff, New York City, for defendant.

## *OPINION*

CHIN, District Judge.

In this case, plaintiff Bridgeway Corporation ("Bridgeway") seeks to enforce a $189,376.66 judgment rendered in its favor by the Supreme Court of Liberia in Monrovia, Liberia (the "Liberian Judgment") against defendant Citibank d/b/a Citicorp, N.A. ("Citibank").[1] For the reasons set

---

1. Citibank states that it is unaware of any activity conducted in Liberia or elsewhere by an entity named Citibank d/b/a Citicorp N.A., the name used by Bridgeway to identify the defendant in this action. In its Answer, however, Citibank admits that "at certain times in

forth below, Bridgeway's motion for summary judgment is denied. Furthermore, because I find that the Liberian Judgment is unenforceable as a matter of law, summary judgment shall be entered in favor of Citibank.

## BACKGROUND

I provide summaries of (a) Liberia's government, its recent civil war, and its judiciary; (b) the underlying facts in this case; and (c) the prior proceedings in this case, including the proceedings in Liberia.

### A. *Liberia*[2]

#### 1. *The Government and History of Civil War in Liberia*

 The nation now known as Liberia was originally established by the American Colonization Society, an organization that was founded in 1817 to resettle freed American slaves in Africa. The first such emancipated slaves settled in Liberia in 1822. A constitution modeled on the United States Constitution was adopted, and Liberia became an independent republic in 1847.

The original 1847 Constitution was amended in 1976 and again in 1986. In many respects, the government established under the most recent amendments mirrors the United States Government. Indeed, under the 1986 Constitution, Liberia has a unitary government, consisting of three separate, distinct, but coordinate branches—a Legislature, an Executive branch, and a Judiciary.

From 1980 to 1989, the Liberian government was headed by Samuel Kanyon Doe. Doe's regime was marked by corruption, human rights abuses, and, by the late 1980s, rampant inflation. In December of 1989, a group of dissidents began an uprising and took over the government of Liberia. Doe was executed by a group of rebels on September 12, 1990. His murder marked the end of constitutional government in Liberia and the beginning of a seven-year civil war, during which the country was consumed by violence.

By 1991, Liberia was effectively ruled by two governments. One government controlled Monrovia, while a rebel group controlled the remainder of the country. An attempt to reach a peace accord in 1992 proved unsuccessful, and in September 1992, hostilities broke out. Boys as young as eight years old were recruited to fight, and civilians who refused to join the rebel forces were executed. Monrovia was held under siege, and thousands of civilians were killed in the crossfire.

Another peace conference was held in July 1993 among the various warring factions. They drew up a plan for a Liberian National Transitional Government, to be led by a five-member Council of State. A cease-fire was implemented, but again, was short-lived. Hostilities flared up again in late 1993, with two new armed forces sprouting up. By mid–1994, the cease-fire

---

the past, Citibank maintained banking operations in Liberia through its branch, Citibank, N.A. Liberia." Thus, while Citibank apparently contends that Bridgeway referred to the defendant by the wrong name in the Complaint, it does not contend that Bridgeway has sued the wrong entity.

**2.** Unless otherwise indicated, the facts in this section are drawn from the materials submitted by the parties as well as the following: Joseph Tellewoyan, *The Liberian Civil War* (visited Mar. 29, 1999) <http://pages.prodigy.net/jtell/Civilwar.html>; *Liberia,* Encarta Multimedia Encyclopedia (Microsoft 1997); *CNN News Articles: Elections Archive Articles* (posted Feb. 25, 1997 to Jul. 22, 1997)

<http://www.geocities.com/Athens/Delphi/9352/Elections.html>; *CNN News Reports: Mid War Articles* (posted Apr. 8, 1996 to Aug. 18, 1996) <http://w ww.geocities.com/Athens /Delphi/9352.midwar.htm>.

Pursuant to Fed.R.Evid. 201(b)(1), I am permitted to take judicial notice of adjudicative facts "generally known" within the territorial jurisdiction of this Court, including facts pertaining to matters of history and politics. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 50, at 263–64 (2d ed.1994). Accordingly, I take judicial notice of the facts contained in these sources for purposes of resolution of this dispute.

had completely failed, and fighting continued. The United Nations Observer Mission in Liberia intervened in March of 1994. Around this time, the United States Government issued a report condemning the widespread human rights violations in Liberia, noting in particular the massacre of civilians.

In August of 1994, the leaders of the various factions met secretly to discuss a timeline for disarmament and the institution of the 1993 Council of State plan. There was another brief cease-fire in December of 1994, and finally, a formal peace accord was signed on August 19, 1995. In September of 1995, a new government was organized, and the Council of State was tentatively established. Its authority, however, was tenuous. Moreover, disarmament was never achieved.

Hostilities flared up again in April of 1996. An uprising was sparked in the outskirts of Monrovia, and quickly spread into the capital city. Street fighting erupted in the city, accompanied by widespread looting, and, eventually, the new government collapsed. Another cease-fire was declared in May of 1996.

The restoration of peace and democracy in Liberia began in 1997. An election was held in July of 1997, the first democratic election in Liberia in 12 years. Charles Taylor was elected President, garnering 75% of the votes, and the newly elected government was inaugurated in August of that year. At the same time, the 1986 Constitution was reinstated by a joint resolution of the National Legislature.

Commentators have observed that, between 1989 and 1996, as many as 200,000 people were killed in Liberia, and that well over one million Liberian citizens were left homeless as a result of the civil war. Approximately 750,000 Liberians fled the country seeking refuge in other countries. Other commentators have reported that the fighting destroyed much of Liberia's economy, that the unemployment rate during the hostilities was as high as 80 to 90%, and that during the period of civil war in Liberia, corruption was rampant in all government organizations.

### 2. The Judiciary

Pursuant to the 1986 Constitution, the judicial powers of the Liberian government are vested in the Supreme Court and such subordinate courts as the Legislature may establish. The Supreme Court consists of one chief justice and four associate justices. Justices and judges are nominated by the President of Liberia and confirmed by the Liberian Senate. Once appointed, a justice or judge has life tenure, unless removed as a result of impeachment, resignation, or death.

After the civil war began in 1990, however, the provisions of the 1986 Constitution relating to the judiciary were no longer followed. Because the government was undergoing upheaval, justices and judges were no longer nominated by an executive authority, and were no longer confirmed by an elected legislative body.

In 1992, the Supreme Court was reorganized. The warring factions agreed that one faction could appoint three justices to the court, including the chief justice, and that the other could appoint two justices to the court. In his First Sworn Statement, H. Varney G. Sherman, a Liberian attorney, former president of the Liberian National Bar Association, and counsel to Citibank's branch in Liberia ("Citibank Liberia"), states that it was the head of each of these two factions who made the appointments to the court, and that, during this period, "it was common knowledge that members of the Supreme Court served at the will and pleasure of the appointing powers." (First Sworn Statement of H. Varney G. Sherman dated June 2, 1998 ("Varney Aff. I") ¶ 5).

One of the justices appointed by one faction died in 1992, and the other unilaterally appointed one of its justices as the new chief justice. The Supreme Court thus had only four justices at that time, and Varney asserts in his affidavit that,

from that point forward, the Supreme Court became an instrumentality of one of the factions. (Varney Aff. I ¶ 6). In 1994, the factions agreed that a fifth justice could be appointed by a third faction. Once again, the fifth justice was appointed exclusively by the leader of the faction, rather than in accordance with the appointment procedures provided for in the 1986 Constitution.

The portrayal of the Liberian judiciary in Varney's First Sworn Statement is consistent with that contained in the U.S. Department of State's Country Reports on Human Rights Practices for Liberia for the years 1994–97. For example, the 1994 report stated that all levels of the court system were functioning "erratically," and that "corruption and incompetent handling of cases remained a recurrent problem." (Def.'s Ex. 6). This report also stated that one of the improvements in the judicial system from the previous year was the implementation of a requirement that "circuit court judges be law school graduates." *Id.* Finally, the 1994 Report stated that, since 1991, legal and judicial protections in the part of the country controlled by one of the factions were "almost totally lacking," and that in areas controlled by other factions, "there was little pretense of due process," and that "swift justice was meted out by faction leaders." *Id.*

The 1995 Report depicted an equally bleak picture of the Liberian judicial system. This report stated that, in 1995, "the judicial system continued to be hampered by inefficiency and corruption." *Id.* The report stated further that, "because of the war, the judiciary does not function in most areas of the country," and that where it does function, "it is in practice subject to political, social, familial, and financial suasion." *Id.* Furthermore, while the Constitution theoretically provided for due process rights, "[m]ost of these rights ... were ignored in practice." *Id.* Similarly, the 1996 Report stated that "the judicial system, already hampered by inefficiency and corruption, collapsed for six months following the outbreak of fighting in April."

Finally, it appears that even after the conflict ended, problems with the judicial system persisted. Indeed, the 1997 Report stated that the Liberian judiciary was still "subject to political influence, outside pressure, and corruption" and continued to be subject to "political, social, familial, and financial pressures." *Id.* The report stated further that, "[e]ven after the elections, the judiciary did not function in most areas of the country due to lack of infrastructure," and that due process rights continued to be "ignored in practice." *Id.*

In 1997, in anticipation of the first democratic election in 12 years, the leaders of the various factions acknowledged that the membership of the Supreme Court had been based on factional loyalties since 1992, and agreed that any specter of factional loyalties would have to be eradicated to enhance the credibility of any electoral dispute that might be decided by the Supreme Court. Convinced that the international community would not accept a decision of the Supreme Court on any electoral dispute unless the membership was changed and the process for the selection of new justices reformed, the Council of State organized a new Supreme Court. The members of the court were dismissed, and new members were appointed based on recommendations by the Liberian National Bar Association. Accordingly, in August of 1997, the new Supreme Court was organized under the 1986 Constitution, through nominations by the President and confirmation by the Liberian Senate.

## B. *The Underlying Facts*

Bridgeway is a Liberian corporation with a principal place of business in Monrovia, Liberia. Citibank is a national banking association incorporated under the laws of the United States with a principal place of business in New York, New York. Bridgeway maintained funds at Citibank Liberia, located in Monrovia.

In November of 1991, the decision was made to close Citibank Liberia because Liberia was undergoing a violent civil war. Thereafter, Citibank Liberia formulated a plan of liquidation that was ultimately approved by the National Bank of Liberia (the "National Bank"), the government agency that regulates the commercial banking industry in Liberia. Under the liquidation plan, Citibank Liberia remitted funds to the National Bank. The National Bank, in turn, remitted funds to Meridien Bank Liberia Limited ("Meridien"), an entity appointed by the National Bank to pay all deposit liabilities on behalf of Citibank Liberia.

Pursuant to Liberian law, implementation of the liquidation plan had to be completed within three years. Accordingly, the liquidation period for Citibank Liberia began on February 1, 1992 and ended on January 31, 1995. At the end of the three-year period, all deposit liabilities of Citibank Liberia that had not been settled by Meridien were identified, and title to the funds remitted to Meridien passed back to the National Bank, also as required by Liberian law. The National Bank, however, elected to have Meridien remain as the depository for those funds.

Citibank Liberia's license to engage in banking in Liberia was terminated as of January 31, 1992. By letter dated April 21, 1995, the National Bank confirmed this fact and confirmed that Citibank Liberia had satisfactorily complied with the liquidation plan. Citibank was thereafter struck from the list of financial institutions licensed to do business in Liberia.

Bridgeway had opened an account at Citibank Liberia on June 7, 1982 by depositing an amount of funds in U.S. dollars. The account opening form signed by Bridgeway expressly stated that "the account and all transactions in respect thereof will be governed by the Savings Account Provisions and Rules and applicable regulations." (Affidavit of H. Varney G. Sherman dated June 2, 1998 ("Varney Aff. II") ¶ 11). Additionally, the passbook issued by Citibank Liberia to Bridgeway contained the following statement: "Withdrawals from an account may be made only at the Bank and only upon the presentation of the pass-book and withdrawal orders satisfactory as to form and signature to the Bank. Payment may be made by the Bank in any money lawfully circulating in Liberia at the time of withdrawal." (*Id.* ¶ 12).

In 1992, Bridgeway had a balance of L$189,376.66 in its account at Citibank Liberia. Concerned about the security of its deposits in light of the civil war and the liquidation of Citibank Liberia, Bridgeway demanded repayment of its funds from Citibank Liberia in U.S. dollars. Citibank Liberia refused to repay the funds in U.S. dollars. Citibank Liberia did, however, remit funds in Liberian dollars to the National Bank to cover Citibank Liberia's deposit liability to Bridgeway. The total amount set aside to cover this deposit liability was L$191,287.87, representing the L$189,376.66 deposit plus accrued interest.

### C. *Prior Proceedings*

#### 1. *Proceedings in the Liberian Courts*

On November 21, 1992, Bridgeway commenced a declaratory judgment action against Citibank in the Liberian courts claiming that it was entitled to be repaid its deposited funds in U.S. dollars. The trial court rendered judgment in favor of Citibank and against Bridgeway in August of 1993, holding that the relevant banking laws permitted Citibank to repay deposits in U.S. dollars or in Liberian dollars, at its option, and that, in any event, the two currencies have the same par value. Bridgeway appealed, and on July 28, 1995, the Supreme Court of Liberia reversed the judgment of the trial court and entered judgment for Bridgeway, holding that Citibank must repay Bridgeway's deposited funds in U.S. dollars.

Unhappy with the decision of the Supreme Court, Citibank prepared a petition

for reargument on August 1, 1995. The justices unanimously refused to approve the petition, however. Faced with the prospect of paying twice for the same deposit liability, Citibank made several requests of the National Bank to satisfy the judgment in U.S. dollars out of certain reserve funds that Citibank was required to maintain with the National Bank, or out of the L$191,287.87 that Citibank Liberia had previously deposited with the National Bank to satisfy its deposit liability to Bridgeway under the liquidation plan. The National Bank refused these requests. Citibank then took several additional legal steps to avoid paying twice on the same deposit liability, none of which was successful. Finally, Citibank was forced to file a declaratory judgment action against the National Bank. Its petition, however, was dismissed for lack of standing.

### 2. *Proceedings in this Court*

On October 20, 1997, Bridgeway filed suit against Citibank in New York State Supreme Court, New York County, seeking to enforce the Liberian Judgment. Citibank removed the action to this Court on December 2, 1997, and filed an Answer on March 17, 1998. These motions followed.

### *DISCUSSION*

### A. *Standards for Summary Judgment*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. As the Supreme Court stated in *Anderson*, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

"In considering a motion for summary judgment, if [the court's] analysis reveals that there are no genuine issues of material fact, but that the law is on the side of the non-moving party, [the court] may grant summary judgment in favor of the non-moving party even though it has made no formal cross-motion. Summary judgment may be granted to the non-moving party in such circumstances so long as the moving party has had an adequate opportunity to come forward with all of its evidence. Notice to the moving party of the intention to grant summary judgment in favor of the non-moving party is not required; rather, the court must simply be satisfied that the moving party will not suffer any procedural prejudice resulting from an inadequate opportunity to fully present its case." *Orix Credit Alliance, Inc. v. Horten*, 965 F.Supp. 481, 484

(S.D.N.Y.1997) (citations omitted). With these standards in mind, I turn to Bridgeway's motion for summary judgment.

## B. *Applicable Legal Standards*

In this case, Bridgeway seeks enforcement of the Liberian Judgment. Citibank, on the other hand, asserts several defenses to enforcement of the judgment, one of which is that, under New York CPLR Art. 53, the judgment is unenforceable as a matter of law because the judgment was "rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." *See* N.Y. C.P.L.R. § 5304(a)(1) (McKinney 1997) (hereinafter "CPLR"). Bridgeway's central argument in support of summary judgment is that Citibank should be judicially estopped from asserting this defense to enforcement of the judgment. Hence, two principal issues are presented: (1) whether Citibank is judicially estopped, and (2) whether, in fact, the Liberian justice system comports with the requirements of due process.

### 1. *Judicial Estoppel*

■ The doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *accord United States v. King*, 165 F.3d 15, No. 97–1522, 1998 WL 781594, at *1 (2d Cir. Nov. 9, 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1275, —— L.Ed.2d —— (1999). "The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). In short, the aim of the doctrine is

to "protect 'the integrity of the judicial process.'" *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir.1997) (quoting *Bates*, 997 F.2d at 1037). In this circuit, a party invoking judicial estoppel must show (1) that the party against whom estoppel is asserted took an inconsistent position in a prior proceeding, and (2) that that position was adopted by the court in some manner. *King*, 165 F.3d 15, 1998 WL 781594, at *1; *Maharaj*, 128 F.3d at 98; *Motrade v. Rizkozaan, Inc.*, No. 95 Civ. 6545, 1998 WL 108013, at *6 (S.D.N.Y. Mar. 11, 1998).

Bridgeway argues that judicial estoppel bars Citibank from asserting that the Liberian Judgment is unenforceable because Citibank voluntarily appeared in the litigation in Liberia, but at no time contended that the Liberian system of jurisprudence is defective in any way. Indeed, Bridgeway contends, Citibank actually prevailed in the trial court and only argues that the Liberian judicial system is impartial now that the judgment in its favor has been reversed by the Supreme Court of Liberia. Bridgeway argues further that Citibank has appeared in numerous actions in the Liberian courts and has even appeared as the plaintiff in several of these actions, but has never once challenged the fairness of the Liberian system of jurisprudence. In essence, Bridgeway argues that, in the Bridgeway action and in other proceedings, Citibank has implicitly taken the position that the Liberian courts and the Liberian judicial system in general are fair and impartial and are governed by procedures that comport with the requirements of due process of law, and that, accordingly, Citibank should be barred from asserting otherwise in the present action to enforce the Liberian Judgment.

■ While Bridgeway's argument does have some appeal, I conclude as a matter of law that Citibank is not judicially estopped from arguing that the Liberian Supreme Court is unenforceable. I reach this conclusion for several reasons.

First, Bridgeway has not demonstrated that the requirements of judicial estoppel

have been met. Citibank never took the position in the Liberian proceedings that the Liberian courts are impartial and that the Liberian judicial system operates in accordance with the basic requirements of due process. That Citibank chose to defend itself in Liberia when sued surely does not mean that it waived any and all objections it might have to the fairness of the Liberian judicial system. Hence, Citibank cannot be said to have taken a position in a prior proceeding that is inconsistent with its position here. Moreover, even assuming that Citibank can be said to have taken an inconsistent position in the prior action, because the issue of the fairness of the Liberian judicial system was not actually raised and litigated in the Liberian proceeding, the Liberian courts cannot be said to have adopted the inconsistent position taken by Citibank.

Second, there is no support in the case law for the application of judicial estoppel in these circumstances. Indeed, Bridgeway has not come forward with a single case holding that a party must specifically raise the issue of impartiality of the foreign tribunal before which a matter is pending to preserve its right to assert that argument in opposing a subsequent action in a U.S. court to enforce the foreign judgment, nor has the Court's research revealed any such case. The cases cited by plaintiff in support of its judicial estoppel argument are clearly distinguishable. *See, e.g., Guinness PLC v. Ward,* 955 F.2d 875, 899–900 (4th Cir.1992) (holding that judicial estoppel barred defendant from relying on a settlement to avoid enforcement of foreign judgment where defendant had failed to advise the foreign appellate courts that the settlement had rendered the appeal moot).[3]

■ Finally, as a policy matter, parties in foreign proceedings should not be required to explicitly assert the position that the particular forum in which they are litigating is unfair and impartial to preserve their right to challenge the enforceability of the judgment rendered by that tribunal in a subsequent proceeding. Indeed, the very reason statutes such as CPLR Article 53 exist is so that parties who believe that they have not been treated fairly in foreign courts have an avenue of redress in courts in the United States. To hold that Citibank is barred from collaterally attacking the Liberian Judgment on the ground that it failed to challenge the fairness and impartiality of the Liberian judicial system would offend the very notion of due process that statutes such as CPLR Article 53 were designed to uphold.

For all of these reasons, Bridgeway's judicial estoppel argument is rejected, and accordingly, its motion for summary judgment on the basis of judicial estoppel is denied.

Having held that Citibank is not judicially estopped from asserting the CPLR Article 53 defense to enforcement of the Liberian Judgment, the question remains whether the Liberian Judgment is enforceable as a matter of law. Accordingly, I

---

**3.** The only other case we have found addressing the doctrine of judicial estoppel in an action to enforce a foreign judgment, *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (9th Cir.), *cert. denied,* 516 U.S. 989, 116 S.Ct. 519, 133 L.Ed.2d 427 (1995), does not support Bridgeway's position either. There, the plaintiffs brought an action in the Central District of California to enforce a default judgment against the sister of the former Shah of Iran rendered in the Iranian courts. *Id.* at 1408. In opposing enforcement, the defendant argued that the default judgment was rendered without due process of law, and that, even if she had appeared in the action, she could not have received a fair trial in the Iranian courts. *Id.* at 1408, 1413. The plaintiffs attempted to show that the defendant had argued in an earlier, unrelated action that any claims against her would more properly be tried in Iran, and apparently argued that she should be estopped from taking the position in the current action that the Iranian courts would not give her a fair trial. *Id.* at 1413. The Ninth Circuit rejected the plaintiffs' judicial estoppel argument, holding that the position taken by the defendant in the prior action was "not truly inconsistent with her present position." *Id.*

now turn to the merits of Bridgeway's claim of enforcement.

## 2. Principles Governing Enforcement of Foreign Judgments

### a. Comity

■ The recognition and enforcement of foreign judgments are governed by principles of comity. *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F.Supp. 609, 615 (S.D.N.Y.1991); *accord Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir.1987); *see also Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The seminal case in the area of enforcement of foreign judgments, *Hilton v. Guyot*, explains the doctrine of comity as follows:

> No law has any effect ... beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, ... by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call "the comity of nations"....
>
> "Comity" ... is the recognition which one nation allows within its territory to the ... judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. at 163–64, 16 S.Ct. 139. The Supreme Court in *Hilton* held that if the foreign forum provides a full and fair trial before a court of competent jurisdiction, "under a system of jurisprudence likely to secure an impartial administration of justice ... and there is nothing to show either prejudice ... or fraud in procuring the judgment," the judgment should be enforced and not "tried afresh." *Id.* at 202–03, 16 S.Ct. 139.

The practice of " 'extend[ing] comity whenever the foreign court ha[s] proper jurisdiction and enforcement does not prej-

udice the rights of United States citizens or violate domestic public policy' has consistently been followed in this Circuit." *Pariente*, 771 F.Supp. at 615 (quoting *Victrix*, 825 F.2d at 713 and citing *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir.1985); *Clarkson Co. v. Shaheen*, 544 F.2d 624 (2d Cir.1976)).

### b. New York CPLR Article 53

■ New York law governs actions brought in New York to enforce foreign judgments. *Canadian Imperial Bank of Commerce v. Saxony Carpet Co.*, 899 F.Supp. 1248, 1252 (S.D.N.Y.1995) (citing *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India*, 809 F.2d 195, 204 (2d Cir.), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987) and *Pariente*, 771 F.Supp. at 615), *aff'd*, 104 F.3d 352 (2d Cir.1996).

In New York, "courts 'generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the [foreign] judgment would offend a strong policy of New York.'" *Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 962 F.Supp. 420, 425 (S.D.N.Y.1997) (quoting *Lasry v. Lasry*, 180 A.D.2d 488, 579 N.Y.S.2d 393, 393–94 (1st Dep't 1992)). Indeed, New York has a "long-standing" tradition of "permitting the enforcement of foreign country money judgments." *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610, 615 (S.D.N.Y.1979) (citing *Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313, 1318 n. 6 (2d Cir.1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974); *see also Cowans v. Ticonderoga Pulp & Paper Co.*, 246 N.Y. 603, 159 N.E. 669 (N.Y.1927); David D. Siegel, Practice Commentaries, 7B McKinney's Cons.Laws of NY, CPLR C5304:1, at 548 (McKinney's 1997) (describing New York as "generous"

in the recognition of the judgments of foreign nations) (hereinafter "Siegel Commentaries").

New York has codified the principles of comity by statute in the "Uniform Foreign Money–Judgments Recognition Act." *See* CPLR Article 53. Article 53 provides that "a foreign country judgment . . . is conclusive between the parties to the extent that it grants or denies recovery of a sum of money." CPLR § 5303. The article applies to "any foreign country judgment which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal." *Id.* § 5302.

A foreign country judgment is "not conclusive," however, if either of the following two circumstances exists: (1) "the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law"; or (2) "the foreign court did not have personal jurisdiction over the defendant." *Id.* § 5304(a). These bases of non-recognition preclude courts from recognizing the foreign judgment as a matter of law. *See* Siegel Commentaries at 548–49; 11 Jack B. Weinstein *et al., New York Civil Practice* ¶ 5304.01 (1998) (hereinafter "Weinstein CPLR").

Similarly, a foreign country judgment "need not be recognized" if: (1) the foreign court did not have subject matter jurisdiction; (2) the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable a defense; (3) the judgment was obtained by fraud; (4) the cause of action violates public policy; (5) the judgment conflicts with another final and conclusive judgment; (6) the proceeding in the foreign country was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or (7) the foreign court was a seriously inconvenient forum for the trial of the action. CPLR § 5304(b). These bases of non-

recognition are discretionary. Weinstein CPLR ¶ 5304.02.

### c. *Burdens of Proof*

The burden of proof in "establishing the conclusive effect of a foreign judgment is on the party asserting conclusiveness." *Id.* ¶ 5302.01. As the Second Circuit has explained:

> [A] plaintiff seeking enforcement of a foreign country judgment granting or denying recovery of a sum of money must establish prima facie: (1) a final judgment, conclusive and enforceable where rendered; (2) subject matter jurisdiction; (3) jurisdiction over the parties or the *res;* and (4) regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process.

*Ackermann v. Levine,* 788 F.2d 830, 842 n. 12 (2d Cir.1986) (citations omitted). Once a plaintiff establishes a prima facie case of enforceability, a defendant may then raise defenses such as fraud and public policy. *Id.* Although the *Ackermann* court did not specify how these burdens apply with respect to CPLR Article 53, as a matter of logic, it would appear that the plaintiff seeking enforcement of the foreign judgment bears the burden of proving that no mandatory basis for non-recognition pursuant to CPLR § 5304(a) exists, and that the defendant opposing enforcement has the burden of proving that a discretionary basis for non-recognition pursuant to CPLR § 5304(b) applies. *See S.C. Chimexim, S.A. v. Velco Enters. Ltd.,* 1999 WL 223513, at *6, No. 98 Civ. 0142 (S.D.N.Y. Mar. 17, 1999).

### d. *Application*

In this case, Citibank does not dispute that Bridgeway has established the first three elements of a prima face case. Rather, Citibank challenges enforcement of the Liberian Judgment on the ground that Bridgeway has failed to offer any evidence that the Liberian Supreme Court was impartial or that its procedures were

compatible with due process of law, at the time the Liberian Judgment was rendered. On the record before the Court, a reasonable factfinder could only conclude that, at the time the judgment at issue here was rendered, the Liberian judicial system was not fair and impartial·and did not comport with the requirements ,of due process. The Liberian Judgment is, therefore unenforceable as a matter of law.

First, the record demonstrates that, throughout the period ·during which the Liberian action was pending, the country was embroiled in a civil war. The country was in a state of chaos, as the various factions fought. The Liberian Constitution was ignored. Some 200,000 Liberian citizens were killed, more than one million more were left homeless, and approximately 750,000 fled Liberia to seek refuge in other countries. It is difficult to imagine any judicial system functioning properly in these circumstances.

Second, the record shows that the regular procedures governing the selection of justices and judges had not been followed since the suspension of the 1986 Constitution. As a result, justices and judges served at the will of the leaders of the warring factions, and judicial officers were subject to political and social influence. The Liberian judicial system simply did not provide for impartial tribunals.

Third, the courts that did exist were barely functioning. The due process rights of litigants were often ignored, as corruption and incompetent handling of cases were prevalent. Although the Liberian judicial system might have been modeled on our own, it did not comport with the requirements of due process during the period of civil war.

Bridgeway offers the following as evidence that the Liberian judicial system is a system of jurisprudence likely to secure an impartial administration of justice: (1) a statement in the certification of James E. Pierre, Esq., a member of the Liberian Bar and the attorney who represented Bridgeway in the Liberian action, that the procedural rules of Liberia's courts are modeled on those of the New York State courts (Certification of James E. Pierre dated April 23, 1998 ¶ 6); (2) H. Varney G. Sherman's statement in his First Sworn Statement that, "[i]n essence, the Liberian Government is patterned after state governments of the United States of America" (Varney Aff. I ¶ 2); ,and, (3) a statement in the certification of N. Oswald Tweh, former Vice President of the Liberian National al Bar Association and also counsel to Bridgeway, that "Liberia's judicial system was and is structured and administered to afford party-litigants therein impartial justice." (Certification of N. Oswald Tweh dated July 6, 1998 ¶ 5).

 The evidence presented by Bridgeway does not create a genuine issue of fact requiring a trial in this action. First, that the Liberian judicial system was modeled after judicial systems in the United States does not mean, of course, that the Liberian system was actually implemented in a manner consistent with procedures used in the American courts. Second, the statement that "Liberia's judicial system was and is structured and administered to afford party-litigants therein impartial justice" is purely conclusory and is not, by itself, sufficient to raise a genuine issue of fact. *See Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.") (citation omitted); *Tadros v. Coleman,* 717 F.Supp. 996, 1006 (S.D.N.Y.1989) ("[S]elf-serving, conclusory allegations cannot defeat" motion for summary judgment), *aff'd,* 898 F.2d 10 (2d Cir.), *cert. denied,* 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149 (1990).

No genuine issues ·of fact exist for trial. On the record before the Court, a reasonable factfinder could only conclude that the

288

Liberian Judgment was rendered by a system that does not provide impartial tribunals or procedures compatible with the requirements of due process. Accordingly, the Liberian Judgment will not be enforced.

### *CONCLUSION*

For the foregoing reasons, Bridgeway's motion for summary judgment is denied. Furthermore, because I conclude that the Liberian judgment is unenforceable as a matter of law, summary judgment is hereby granted in favor of Citibank. Bridgeway's complaint is dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.