**BRIDGEWAY CORPORATION,**
**Plaintiff–Appellant,**

**v.**

**CITIBANK, doing business as Citicorp N.A., Defendant–Appellee.**

**Docket No. 99–7504.**

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1999.

Decided Jan. 3, 2000.

Michael J. Calvey, New York City (Thomas G. Amon and Mark J. Lawless, of counsel, on the brief), for Plaintiff–Appellant.

J. Kelley Nevling, Jr., New York City (Petra T. Tasheff, of counsel, on the brief), for Defendant–Appellee.

Before: LEVAL, CALABRESI, and KATZMANN, Circuit Judges.

CALABRESI, Circuit Judge:

Bridgeway Corp. ("Bridgeway"), a Liberian corporation seeking to enforce a final judgment rendered by the Supreme Court of Liberia, appeals from the district court's decision denying Bridgeway's motion for summary judgment and granting, *sua sponte*, summary judgment in favor of the nonmoving party, Citibank. The district court held, first, that Citibank was not judicially estopped from challenging the fairness of the Liberian judicial system simply because it had participated voluntarily in litigation in Liberia and, second, that the evidence in the record established, as a matter of law, that the Liberian judicial system was not "a system that ... provide[s] impartial tribunals or procedures compatible with the requirements of due process." *Bridgeway Corp. v. Citibank*, 45 F.Supp.2d 276, 288 (S.D.N.Y. 1999). We affirm.

## I. BACKGROUND

### A. Overview of Liberian History

This appeal derives from an action by Bridgeway to enforce a money judgment against Citibank entered by the Supreme Court of Liberia on July 28, 1995. Because the merits of this case turn on the events surrounding the Liberian civil war during the first half of the 1990s, it is helpful to provide a brief overview of those circumstances before proceeding to discuss the case. The following facts are drawn from the district court's thoughtful opinion and are not traversed in the record before us.

Liberia was founded in 1817 to resettle freed American slaves, and in 1847 it became an independent republic. The original 1847 Constitution, amended in 1976 and again in 1986, established a government modeled on that of the United States. Under the 1986 Constitution, for

example, the judicial powers of the Liberian government are vested in a Supreme Court and such subordinate courts as the Legislature may establish. The Supreme Court is composed of one chief justice and four associate justices. Justices and judges are nominated by the President and confirmed by the Senate and have life tenure unless impeached.

From 1980 to 1989, Samuel Kanyon Doe headed a Liberian government marked by corruption and human rights abuses, as well as by rampant inflation. In 1989, a group of dissidents seized power and, in 1990, executed Doe. Doe's death marked the beginning of a violent seven-year civil war. By 1991, Liberia was in effect ruled by two governments: one controlled Monrovia, the capital, while the other controlled the remainder of the country. Following several short-lived cease fires, a formal peace accord was signed in August 1995. After another outbreak of violence in 1996, elections were held in July 1997. In August 1997, Charles Taylor was inaugurated and the 1986 Constitution was reinstated.

Throughout the period of civil war, Liberia's judicial system was in a state of disarray and the provisions of the Constitution concerning the judiciary were no longer followed. Instead, under an agreement worked out among the warring parties in 1992, the Supreme Court was reorganized, with various factions each unilaterally appointing a specified number of justices. The U.S. State Department Country Reports for Libiera during this period paint a bleak picture of the Liberian judiciary. The 1994 Report observed that "corruption and incompetent handling of cases remained a recurrent problem." The 1996 Report stated that, "the judicial system, already hampered by inefficiency and corruption, collapsed for six months following the outbreak of fighting in April."

In 1997, before elections were held, the leaders of the various factions acknowledged that the integrity of the Supreme Court had been compromised by factional loyalties since 1992 and agreed that the Court would have to be reconstituted so that it might gain the legitimacy that would enable it to resolve successfully disputes that might arise concerning the elections. The members of the Court were therefore dismissed and new members were appointed based on the recommendations of the Liberian National Bar Association.

## B. This Case

Plaintiff-appellant Bridgeway is a Liberian corporation with its principal place of business in Monrovia, Liberia. Defendant-appellee, Citibank, is a U.S. banking corporation with its principal place of business in New York. For many years Citibank maintained a branch in Monrovia, but it closed that branch in January 1992 and completely withdrew from Liberia by 1995. As required by Liberian law, Citibank, before withdrawing, formulated a plan of liquidation, which was approved by the National Bank of Liberia. According to this plan, funds were to be remitted by Citibank to Meridian Bank Liberia Ltd., in order to meet Citibank's obligations to depositors. Citibank alerted its customers to its plans so that they could withrdraw their funds. On April 21, 1995, the National Bank of Liberia indicated by letter that Citibank had satisfactorily completed the liquidation plan and was no longer licensed to do business in Liberia.

Bridgeway had an account at Citibank's Liberian branch with a balance of $189,-376.66. In November 1992, Bridgeway brought suit in Liberia against Citibank, seeking a declaration that Citibank was obligated to pay Bridgeway its balance in U.S. (rather than Liberian) dollars. In August 1993, the trial court ruled in favor of Citibank. The court found that, under Liberian law, a person may not refuse to accept Liberian dollars for the discharge of an obligation unless there is an express agreement to the contrary and that Liberian law gives the Liberian dollar a par value equal to the value of the U.S. dollar.

The trial court also found that under Bridgeway's contract with Citibank, the latter had the right to decide the currency in which a withdrawal would be paid. Bridgeway appealed to the Liberian Supreme Court, which reversed the lower court's decision and entered judgment for Bridgeway.

Bridgeway filed suit in New York state court to enforce the Liberian Supreme Court judgment, and Citibank removed the case to the federal district court. When it became apparent that Citibank was going to defend itself by challenging the legitimacy of the Liberian judicial system, Bridgeway moved for summary judgment—arguing that Citibank was estopped from questioning the fairness of the Liberian judiciary. But the district court denied that motion and, *sua sponte*, granted summary judgment for Citibank. Specifically, the court found that, as a matter of law, Liberia's courts did not constitute "a system of jurisprudence likely to secure an impartial administration of justice" and that, as a result, the Liberian judgment was unenforceable in the United States. *See Bridgeway*, 45 F.Supp.2d at 287. Bridgeway now appeals.

## II. DISCUSSION

### A. *Sua Sponte* Summary Judgment Against the Moving Party

Bridgeway argues that the district court erred in granting summary judgment against it *sua sponte* without prior notice. In so acting, Bridgeway alleges, the district court deprived Bridgeway of an adequate opportunity to develop and present its case.

■ While it is not necessarily reversible error in our Circuit for a district court to grant summary judgment against the moving party without notice or opportunity to defend, *see Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) ("[The] court need not give notice of its intention to enter summary judgment against the moving party."), we have firmly discouraged the practice. In *Coach Leatherware Co.*, we made clear that grants of summary judgment without notice will be tolerated only in the absence of "some indication that the moving party might otherwise bring forward evidence that would affect the ... determination," *id.*, when "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice." (Now Chief) Judge Winter stressed in his concurrence that such "grants of summary judgment are rare and should be employed only when a court is absolutely sure that no issue of material fact exists." *Id.* at 172 (Winter, *J.*, concurring in part and dissenting in part); *see also Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir.1996) ("Before granting summary judgment sua sponte [without notice], the district court must assure itself that following the procedures set out in Rule 56 [for notice and opportunity to defend] would not alter the outcome."). District courts are well advised to give clear and express notice before granting summary judgment *sua sponte*, even against parties who have themselves moved for summary judgment. The provision of such notice requires relatively little time or effort, and it permits appellate courts much more readily to determine—as they are required to do—whether "the absence of a cross motion affected the result." *Coach Leatherware Co.*, 933 F.2d at 167; *see also Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir.1999) ("[P]roviding the adversely affected party with notice and an opportunity to be heard plays an important role in establishing the fairness and reliability of the order.").

■ If the district court fails to give notice before *sua sponte* granting summary judgment and the moving party was, as a result, procedurally prejudiced, we must reverse. *See id.* A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to present evidence in support of its position. *See id.*

If, however, the party either cannot claim to have been surprised by the district court's action or if, notwithstanding its surprise, the party had no additional evidence to bring, it cannot plausibly argue that it was prejudiced by the lack of notice.

■ "[T]he threat of procedural prejudice is greatly diminished if the court's *sua sponte* determination is based on issues identical to those raised by the moving party." *Id.* In addition, the likelihood of prejudice is greatly reduced, even when summary judgment is based upon issues raised by the nonmoving party, if the moving party speaks to those issues in the course of the district court proceedings.

Moreover, regardless of the basis for summary judgment, [w]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law. *Ramsey,* 94 F.3d at 74. In other words, when the moving party cannot plausibly claim that, had it been given notice of the district court's consideration of summary judgment against it, it would have brought forth additional evidence, the district court's failure to give notice is harmless and a remand is futile. *See First Financial Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109, 115–16 (2d Cir. 1999); *Ramsey,* 94 F.3d at 74 ("The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment."); *Coach Leatherware Co.,* 933 F.2d at 167 ("Absent some indication that the moving party might otherwise bring forward ·evidence that would affect the court's summary judgment determination, failure to provide an opportunity to respond is not reversible error.").

■ In this case, there is nothing in the record to indicate that Bridgeway was procedurally prejudiced by the district court's failure to give notice that it was considering a *sua sponte* grant of summary judgment in favor of Citibank. First, the district court's decision was based upon an issue clearly raised by the defendant below in its memorandum of law in opposition to Bridgeway's motion for summary judgment. Second, Bridgeway argued in its reply to the defendant's memorandum that the evidence it submitted was sufficient to establish that Liberian courts constituted a "system of jurisprudence likely to secure an impartial administration of justice." Suppl. App. at 576. That is, the issue on which the district court based its grant of summary judgment did not arise out of the blue but was clearly put into play by the defendants in response to Bridgeway's motion. Moreover, Bridgeway repeatedly claimed to the district court that it had introduced sufficient evidence concerning that very issue. Under these circumstances, the likelihood that it was surprised by the district court's reliance on that issue—and therefore prejudiced by the court's failure to provide notice before granting summary judgement *sua sponte* to Citibank—was virtually nil.

Bridgeway did not, before the district court, raise any objections based on lack of notice. Nor did it subsequently seek to introduce additional evidence that might have convinced the district court to change its position. *Contrast First Financial,* 193 F.3d at 116 ("[T]he lack of opportunity for [the appellant] to present evidence … before judgment was entered against it was highly prejudicial. Considerable evidence supporting [the appellant's] position had come to light during the [time] between submission of [the] motion to dismiss and the district court's decision. Much of that evidence was eventually placed before the Court when the motions for reconsideration were made."). Indeed, at no point since the district court's decision has Bridgeway identified *any* piece of evidence respecting the Liberian judicial

system that it would have introduced had it been given notice. We therefore conclude that Bridgeway was not procedurally prejudiced by the district court's decision to grant summary judgment *sua sponte* to Citibank, albeit without prior notice to Bridgeway, though we reemphasize that giving such notice is certainly the preferable practice.

## B. Judicial Estoppel

■ Bridgeway next argues that because Citibank voluntarily participated in litigation in Liberian courts, it was judicially estopped from raising any question as to the impartiality of those courts in the instant case. Bridgeway observes that Citibank has taken part in at least a dozen civil cases in Liberia since 1992. And in several of those cases, Citibank appeared as a plaintiff. Having availed itself of Liberia's courts without there raising any objections to the fairness of Liberian justice, Citibank should now be estopped, Bridgeway argues, from calling into question the validity of Liberian judgments. Citibank responds by arguing that its participation in Liberian litigation did not amount to an admission of the fairness of Liberian courts. Moreover, it argues that it could not have raised its objections to Liberia's judicial system in Liberia, because Liberian courts routinely sanction lawyers who question the Liberian judicial system. The district court agreed with Citibank. *See Bridgeway Corp.*, 45 F.Supp.2d at 284.

■ Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding." *Bates v. Long Island R.R.*, 997 F.2d 1028, 1037 (2d Cir.

1993). In this Circuit, "[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999). We have described the type of inconsistency required as a "clear inconsistency between [the party's] present and former positions." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir.1997).

In order for Bridgeway to prevail, we must conclude that voluntarily participating in litigation in a foreign tribunal is fundamentally inconsistent with the belief that the tribunal is unlikely to provide an impartial forum or one that comports with notions of due process. Such a position is without merit. Defending a suit where one has been haled into court, and suing where jurisdiction and venue readily exist do not constitute assertions that the relevant courts are fair and impartial. Accordingly, we do not view Citibank's voluntary participation in Liberian litigation, even as a plaintiff, as *clearly contradictory* to its present position.

## C. Fairness of Liberian Courts[1]

### i. Burden

■ The parties strenuously dispute who bears the ultimate burden of proof with respect to the fairness of the Liberian judicial system. Although there are cases in which the question of the burden might be significant, it does not ultimately matter here. Accordingly, we express no opinion on it. Even if Citibank were to bear both the burden of production and that of persuasion, it has come forward with sufficiently powerful and uncontradicted docu-

---

1. In granting summary judgment, the district court reflexively applied New York law. Citibank argues that federal law should apply. Because of the similarity of the New York and federal standards concerning the enforcement of foreign judgments, however, the district court's application of New York law did not affect the outcome. *Cf. Ackermann v. Levine*,

788 F.2d 830, 842 n. 12 (2d Cir.1986) (observing that under both New York statute and under the common law standard, judgments rendered by a judicial system that fails to be impartial or to conform its procedures to due process are not enforceable). We therefore express no view on whether the district court was correct.

mentary evidence describing the chaos within the Liberian judicial system during the period of interest to this case to have met those burdens and to be entitled to judgment as a matter of law. Thus, the U.S. State Department Country Reports presented by Citibank indicate that the Liberian judicial system was in a state of disarray, as do, more subtly, the affidavits by Citibank's Liberian counsel, H. Varney G. Sherman.

■ The only evidence Bridgeway has introduced in support of its position are three statements by Liberian attorneys: (1) an affidavit of James E. Pierre, Esq., a member of the Liberian Bar, stating that the procedural rules of Liberia are modeled on those of New York State courts; (2) an affidavit introduced by Citibank, in which H. Varney G. Sherman, Citibank's Liberian counsel, states that "the Liberian Government is patterned after the state governments of the United States of America;" and (3) an affidavit of N. Oswald Tweh, former Vice President of the Liberian National Bar Association, that "Liberia's judicial system was and is structured and administered to afford party-litigants therein impartial justice." The first statement concerns the design of the Liberian judicial system, but says nothing about its practice during the period in question.[2] The second, in addition to suffering from the same defect as the first, does not even discuss the Liberian judicial system directly. And the third is purely conclusory. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) ("[C]onclusory statements, conjecture, or speculation by the party re-

sisting the motion will not defeat summary judgment.").

### ii. Evidence

■ Summary judgment cannot be granted on the basis of inadmissible evidence. *See* Fed.R.Civ.P. 56(e). And Bridgeway raises many objections to the evidence relied upon by the district court in determining that Liberia's courts were, as a matter of law, unlikely to render impartial justice. Although the parties argue over a variety of different pieces of evidence, in the absence of any proof supporting Bridgeway's position, we need only consider whether Citibank adduced admissible evidence in sufficient amount to make the district court's decision regarding the performance of the Liberian judiciary during the civil war be supportable as well as uncontroverted. In fact, all of the district court's conclusions concerning this issue can be derived from just two sources: the affidavits of H. Varney G. Sherman ("Sherman affidavits") and the U.S. State Department Country Reports for Liberia for the years 1994–1997 ("Country Reports" or "Reports").

Bridgeway does not object to the admissibility of the Sherman affidavits (except on the ground that they support an argument that Bridgeway alleges Citibank is estopped from making). Indeed, in its brief, Bridgeway cites statements derived from these very affidavits in support of its own position. We will therefore assume that the Sherman material was properly relied upon by the district court.[3]

2. Evidence concerning the design of a judicial system might be sufficient, in the absence of countervailing evidence. But where a party presents evidence concerning the actual practice of a judicial system, evidence about design is not likely to create a genuine issue of material fact.

3. Sherman's affidavits contain much of the information on the basis of which the district court made its decision and wrote its opinion: the history of the Liberian governmental system, the history of the civil war, and some of the effects of the civil war on the Liberian

judicial system. Although Sherman was somewhat restrained in his description, he did indicate that during the civil war the constitutional provisions governing the appointment of Supreme Court justices were not followed, members of the Supreme Court served at the "will and pleasure of the appointing powers," and, when elections were finally called, the parties acknowledged that "membership on the Supreme Court had been based on factional appointment and with factional loyalties." *Cf.* Restatement (Third) of Foreign Relations § 482 cmt. b (1987) ("Evi-

■ The district court also relied quite heavily on the Country Reports. Bridgeway argues that these Reports constitute excludable hearsay. Citibank replies that the Reports are admissible under Federal Rule of Evidence 803(8)(C), which allows the admission of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *See* Fed.R.Evid. 803(8)(C).

■ Rule 803(8) "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies." 31 Michael H. Graham, Federal Practice and Procedure § 6759, at 663–64 (Interim ed.1992). "'Factual finding' includes not only what happened, but how it happened, why it happened, and who caused it to happen." *Id.* at 689. The rule therefore renders presumptively admissible "not merely ... factual determinations in the narrow sense, but also ... conclusions or opinions that are based upon a factual investigation." *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir.1991).

■ In order to fit within the purview of Rule 803(8)(C), the evidence must (1) contain factual findings, and (2) be based upon an investigation made pursuant to legal authority. Once a party has shown that a set of factual findings satisfies the minimum requirements of Rule 803(8)(C), the admissibility of such factual findings is presumed. The burden to show "a lack of trustworthiness" then shifts to the party opposing admission. *See Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir.1998).

In this case, there is little doubt that the Country Reports constitute "factual findings." Moreover, the Reports are certainly gathered pursuant to legal authority:

federal law requires that the State Department submit the Reports annually to Congress, *see* 22 U.S.C. §§ 2151n(d), 2304(b) (1994 & Supp.1999). They are therefore presumptively admissible.

Bridgeway attempts to rebut this presumption by arguing that the Reports are untrustworthy, and it points to language in the State Department's description of their preparation. The State Department says that "[w]e have given particular attention to attaining a high standard of consistency despite the multiplicity of sources and the obvious problems related to varying degrees of access to information, structural differences in political and social systems, and trends in world opinion regarding human rights practices in specific countries." Although this constitutes a frank recognition of the shortcomings intrinsic in any historical investigation, it does not amount (as Bridgeway argues) to an admission of the lack of trustworthiness required to reject the admissibility of these documents.

■ When evaluating the trustworthiness of a factual report, we look to (a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems. *See* Fed.R.Evid. 803(8)(C) advisory committee's note. With the exception of (c), which is not determinative by itself, *cf. id.* ([T]he rule ... assumes admissibility in the first instance but with ample provision for escape if *sufficient negative factors* are present. (emphasis added)), nothing about the Reports calls into question their reliability with respect to these factors. The Reports are submitted annually, and are therefore investigated in a timely manner. They are prepared by area specialists at the State Department. And nothing in the record or in Bridgeway's briefs indicates any mo-

dence that the judiciary was dominated by the political branches of government ... would support a conclusion that the legal system was one whose judgments are not entitled to

recognition."). He concluded that "between July, 1990 and August, 1997, the Supreme Court was not organized in keeping with the 1986 Constitution."

tive for misrepresenting the facts concerning Liberia's civil war or its effect on the judicial system there.[4] *See Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1411 (9th Cir.1995) (relying on Country Reports in granting summary judgment on the issue of the fairness of Iranian courts).

█ In addition to its reliance on the Sherman affidavits and the Country Reports, the district court took judicial notice of historical facts drawn from a variety of sources. *See Bridgeway*, 45 F.Supp.2d at 278 n. 2. Bridgeway objects to this. Even if we agreed with Bridgeway's objection, we would affirm the district court's decision because the facts of which the district court took judicial notice were merely background history and of no moment to the ultimate determination of the fairness of Liberia's courts during the period of the civil war. The information in the district court's opinion concerning the functioning of the Liberian courts during the war is drawn (or could easily be drawn) entirely from the Sherman affidavits and the Country Reports, both of which were clearly admissible.

＊　＊　＊　＊　＊　＊

Having found all of Bridgeway's contentions to be without merit, we AFFIRM the judgment of the district court.

---

**4.** One could certainly imagine situations in which motivational problems might plausibly be present (e.g., a country report on an avowed enemy or a significant ally of the United States), but Bridgeway has raised no such doubts here. Accordingly, we express no views on the admissibility of country reports in those circumstances.