RAPTURE SHIPPING, LTD., Plaintiff,

v.

**ALLROUND FUEL TRADING B.V., Chemoil and Chemoil Corporation, Defendants.**

No. 03 Civ. 738(JFK).

United States District Court, S.D. New York.

Feb. 10, 2004.

Tisdale & Lennon, LLC, New York, New York (Patrick F. Lennon, of counsel), for plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York, New York (Lawrence B. Brennan, of counsel), for defendants.

## ORDER & MEMORANDUM OPINION

KEENAN, District Judge.

### Procedural Background

Plaintiff Rapture Shipping Ltd. ("Rapture"), a Liberian corporation, filed this

action seeking to recover $1,048,483 in alleged property damage and for punitive damages from Defendants Allround Fuel Trading B.V. ("AFT") and Chemoil Corporation ("Chemoil").[1] This suit was filed on January 31, 2003, after a similar action was dismissed in December 2002 by the Rotterdam Court of First Instance (the "Rotterdam Court"). Rapture alleges that defective marine diesel oil[2] delivered by the defendants caused the breakdown of the M/V Monagas II's ("Monagas II") auxiliary engines. Presently before the Court is a motion by the defendants to compel arbitration and stay the action.

### Facts

Through its agent, Oceanmaris Management Inc., Rapture contracted with Praxis Energy Agents, S.A. ("Praxis") for the provision of marine fuel oil to its vessel, the Monagas II. In order to fulfill its contract with Rapture, Praxis entered into a bunker nomination contract with AFT and AFT's parent company, Chemoil. Both the Oceanmaris/Rapture–Praxis and Praxis–AFT/Chemoil contracts are dated November 12, 1999. The Praxis–AFT/Chemoil bunker nomination lists Praxis as the buyer, Chemoil/AFT as the seller and supplier and the Monagas II as the motor vessel to receive the fuel. See Brennan Aff., Ex. 5. The contract also states that Praxis was "[a]cting as contractual buyers and in accordance with instructions received by purchaser M/V 'Monagas II' and owners." Id. In addition, the agreement set forth that the bunker was being nominated in accordance with Chemoil/AFT's general terms and conditions. Id.

On November 15, 1999, AFT/Chemoil sent, by facsimile, a bunker confirmation to Praxis. The bunker confirmation reaffirmed that the sale was based on Chemoil's standard terms and conditions for the sale of marine fuel oil, and offered to provide a copy of those terms and conditions if so requested. See Brennan Aff. Ex. 6. The bunker confirmation established that "[t]he fuel oil will be supplied with the express recognition that procurement was authorized by the owner of the vessel." Id. Finally, the bunker confirmation stated that AFT/Chemoil would "assume that all parties agree to this confirmation unless we are notified in writing within 24 hours." Id.

Although the Monagas II is listed as the vessel to receive the fuel, Rapture is not a signatory or listed as a party to the Praxis–AFT/Chemoil agreement. In fact, Rapture claims not have been aware of either the Praxis–AFT/Chemoil agreement or the November 15, 1999 bunker confirmation. See Lennon Aff. ¶ 5. Rapture makes this claim despite the fact that the Praxis–AFT/Chemoil agreement indicates that it was to be sent to Rapture or its agent, Oceanmaris, as the end users of the fuel oil. See Brennan Aff. Ex. 5.

On November 19, 1999, Chemoil delivered the bunkers to the Monagas II while the vessel was docked in the Port of Rotterdam. Upon delivery of the marine oil fuel, the Chief Engineer of the Monagas II signed a receipt for the fuel. See Brennan Aff. Ex. 7. The receipt signed by the Chief Engineer stated in plain terms that the fuel was delivered "in accordance with Chemoil Corporation's Standard Terms and Conditions of sale." Id. By signing the receipt, the Chief Engineer declared that a copy of the Standard Terms and Conditions had been provided and that he had the authority to bind the "vessel and her owner." Id.

---

1. Defendant AFT was erroneously sued herein as Allround Fuel Trading B.V. Chemoil.

2. Also referred to as marine fuel oil by the parties.

Included among the "Standard Terms and Conditions of Sale of Marine Fuel By Chemoil" is an arbitration provision. Article 12 of the Standard Terms and Conditions state in pertinent part:

a) Any controversy or claim between Buyer and Seller, or between Buyer and the fuel barge contractor, relating solely to the quality or quantity of marine fuels delivered or to be delivered hereunder or to the sum payable for such fuel shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Brennan Aff. Ex. 8.

On or about November 25, 1999, the Monagas II suffered a blackout. Rapture alleges that the blackout was the result of a breakdown of and damage to the Monagas II's engine equipment that was caused by defective and unreasonably dangerous marine fuel oil supplied by AFT and Chemoil at the Port of Rotterdam. *See* Compl. ¶ 11. According to Rapture, the Monagas II was left powerless and stranded during gale force weather conditions that necessitated the procurement of salvage assistance. *Id.* at ¶ 12.

Initially, Rapture sued AFT for damages in the Court of First Instance in Rotterdam, The Netherlands (the "Rotterdam action"). Rapture's claims for relief were based both on theories of contract law and tort. Of particular relevance, Rapture argued that AFT had acted as the selling party toward Rapture and thereby created a contractual relationship between the two parties. Among the defenses of-fered by AFT in opposition to Rapture's claims was the proposition that the Rotterdam Court was not the proper forum. AFT argued that the dispute belonged in arbitration. AFT's argument was made in response to Rapture's contention that a contractual relationship existed between Rapture and AFT.[3]

By decision dated December 19, 2002, the Rotterdam Court dismissed Rapture's claims. *See* Brennan Aff. Exs. 3, 4. The Rotterdam Court assumed that, as Rapture suggested, a contractual relationship was created. The court determined, however, that if a contract had been formed it necessarily incorporated Chemoil's standard terms and conditions of sale. As such, the arbitration clause included therein applied and the Rotterdam Court was not a suitable forum for the action. *See* Brennan Aff. Ex. 4. Not long after the Rotterdam Court dismissed its action, Rapture brought suit in this Court.

## Discussion

■ Unlike the Rotterdam action in which Rapture sought damages based on contract and tort law, the instant action is confined to claims of product liability, negligence and fraud. Nonetheless, Rapture's claims are based on the same incident and involve the same parties.[4] Furthermore, the primary affirmative defense raised— that arbitration should be compelled and the action stayed—is identical to the defense raised and litigated in the Rotterdam action. The initial issue facing the Court, therefore, is what, if any, weight should

---

**3.** Each of the parties has offered what it contends its adversary argued before the Rotterdam Court. As evidence of what the other side argued, the parties cite to portions of the Rotterdam Court's decision referring to the various arguments. Neither party attached the briefs from that action as exhibits, however. As a result, this Court must rely on the characterizations offered by the parties and its own interpretation of the Rotterdam Court's decision in order to determine exactly what was argued in The Netherlands.

**4.** Chemoil was not named as a defendant in the Rotterdam action, but was obviously an interested and involved party as AFT's parent company.

the Rotterdam Court's decision carry in this action. Not surprisingly, the parties are of differing minds when it comes to settling this issue. Rapture contends that the Rotterdam action has no bearing on this Court, whereas AFT/Chemoil believe the Rotterdam decision is entitled to great deference.

■ Whether a domestic court should recognize a judgment of a foreign court is governed by the principles of comity. *See Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir.1987). The concept of comity has a long and respected tradition within our legal system. Commenting in 1895 on the importance of affording foreign judgments a measure of respect, the Supreme Court explained,

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

■ "Under the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir.1997). The courts of this circuit have been particularly consistent in practicing comity toward foreign judgments and proceedings. *See S.C. Chimexim S.A. v. Velco Enters. Ltd.*, 36 F.Supp.2d 206, 211 (S.D.N.Y.1999). Following the Supreme Court's holding in

*Hilton v. Guyot*, courts generally extend comity provided the foreign court had proper jurisdiction and recognition of its judgment or proceeding does not prejudice the rights of United States citizens or violate domestic public policy. *Victrix S.S.*, 825 F.2d at 713. The importance of extending comity whenever these prerequisites have been met has only increased as our economy has become increasingly global and dependent upon international commerce. Affording foreign courts a measure of deference brings a degree of predictability to international commerce that is critical to a smooth functioning of business. *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362–63 (2d Cir.1993).

This dispute is quintessentially one involving international commerce. Thus, there exists a strong presumption in favor of honoring the Rotterdam Court's determination that this is a matter to be decided in arbitration. Rapture seems to believe that because the Rotterdam Court's ruling was primarily in response to a contractual claim made by Rapture, by simply restricting its claims in this Court to non-contract claims the Rotterdam decision can be ignored.

■ As reluctant as district courts are to upset the decisions of other courts of first instance, courts are even more loathe to do so when the arguments smack of inconsistencies seemingly designed to game the system. Consistent with this apprehension, the concepts of estoppel, and in particular judicial estoppel, have developed. "The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [it] in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir.1993). The somewhat simple purpose of judicial estoppel is to prevent the

integrity of the judicial system from being compromised. *See Bridgeway Corp. v. Citibank*, 45 F.Supp.2d 276, 283 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2000). More specifically, judicial estoppel is invoked "as a means to 'preserve the sanctity of the oath' or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." ' *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir.1997) (quoting *Bates*, 997 F.2d at 1038).

■ In order for judicial estoppel to be invoked (1) the party against whom judicial estoppel is to be asserted must have advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position must have been adopted in some manner by the first court. *See Bridgeway Corp.*, 201 F.3d at 141; *AXA Marine & Aviation (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.1996). AFT/Chemoil contends that important inconsistencies exist between Rapture's claims in this Court and the arguments it made and factual positions it adopted before the Rotterdam Court. The essence of AFT/Chemoil's position is that Rapture argued before the Rotterdam Court that an implied contract had been created between it and AFT that should be rescinded based on AFT's breach. AFT/Chemoil do not believe Rapture should now be able to claim that no such contract was ever created.

In reaching its decision, the Rotterdam Court stated, "[T]he contractual claim of Rapture rests on the proposition that AFT acted as the selling party [toward Rapture] and thus, in other words, has made a purchasing agreement [with AFT]." Brennan Aff. Ex. 4, § 3.1. Although Rapture contends that its contractual claim was merely one of many arguments it raised in the Rotterdam action, it is plainly one that was offered and seized upon by the court. In fact, the argument was critical to Rapture's request to have the purchase agreement dissolved because without this argument it would have no basis on which to make its demand. By now arguing that AFT did not act as the selling party toward Rapture and that there is no contractual relationship between it and AFT, Rapture has staked out a position that is inconsistent with one it took in the Rotterdam action.

To simply have offered an argument that is inconsistent with the position advanced before this Court is not enough, however, to warrant the invocation of judicial estoppel. Rapture's claim in the Rotterdam action must have been successful in some manner. *See Bates*, 997 F.2d at 1038. Rapture contends that because the Rotterdam Court refused to grant its request to have the contract rescinded, its argument was not successful. This position is not entirely accurate, however. By basing its ultimate conclusion on the premise that a contractual relationship between Rapture and AFT existed, the Rotterdam Court conferred a measure of success on Rapture's argument even if it did not entirely endorse it. Although the final determination was not what Rapture was hoping it would be, the reality is that the argument was successful to the extent it was adopted by the Rotterdam Court as an underlying premise of its decision.

Admittedly, this action is far from being a classic case for the invocation of judicial estoppel. When this case is viewed with an eye toward the principles and objectives underlying the creation and use of the doctrine of judicial estoppel, however, it becomes apparent that Rapture should not be permitted to deny the existence of a contractual relationship between it and AFT/Chemoil. To allow Rapture to do so would risk the possibility of creating the very situation judicial estoppel is meant to

avoid—an inconsistent result that compromises the integrity of the judicial system.

Although this case might otherwise present a close call as to whether the doctrine of judicial estoppel should be applied, when considered in combination with the strong presumption in favor of extending comity to foreign courts in matters involving international commerce the Court is convinced that the opinion of the Rotterdam Court should be respected. Not only would upsetting the Rotterdam Court's decision risk injecting inconsistency into the judicial process, it would risk injecting the type of inconsistency into international commerce that comity is designed to avoid. Add to the equation the fact that Rapture is the party that brought the Rotterdam action as the plaintiff, and that Rapture is now bound by that decision does not engender any sympathy from this Court. For these reasons the Court believes this action should be sent to arbitration.

### Conclusion

Defendants' motion to compel arbitration and stay this action is hereby granted. The clerk of the court is hereby ordered to transfer this action to the suspense docket pending resolution of the arbitration proceedings. The parties are hereby directed to keep the Court updated of any developments as to the status of the arbitration that might require the Court to return this matter to its active docket.

**SO ORDERED.**