Edward D. MULLINS, et al., Plaintiffs,

v.

CITY OF NEW YORK and the New York City Police Department, Defendants.

No. 04 Civ. 2979(SAS).

United States District Court, S.D. New York.

Nov. 6, 2007.

Lauren E. Schwartzreich, Esq., Gregory K. McGillivary, Esq., Woodley & McGillivary, Washington, DC, Andrew Quinn, Esq., Quinn & Mellea, White Plains, NY, Stephen P. Younger, Esq., Patterson Belknap Webb & Tyler LLP, New York, NY, for Plaintiffs.

Lorie E. Almon, Esq., Gerald Maatman, Esq., Robert S. Whitman, Esq., Seyfarth Shaw LLP, Michele Molfetta, Assistant Corporation Counsel, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

This action is brought by New York City police sergeants against the City and its police department to recover overtime compensation to which they are allegedly entitled under the Fair Labor Standards Act of 1938 (the "FLSA"), but for which they have not been paid. Plaintiffs filed their complaint in 2004, and now, following the close of discovery with respect to six categories of sergeants, move for partial summary judgment on the issue of defendants' liability. Defendants oppose the motion on the ground that there are disputed issues of material fact as to whether plaintiffs are exempt from the FLSA's overtime provisions. For the reasons set forth below, defendants are granted summary judgment on the issue of liability for the period from April 14, 2001 through August 23, 2004. Plaintiffs' motion for partial summary judgment on the issue of liability for the period following August 23, 2004 is denied.

## II. BACKGROUND

### A. Procedural Background

Plaintiffs include over 4,300 police sergeants employed by the New York City Police Department (the "NYPD").[1] On April 19, 2004, on behalf of themselves and those similarly situated, plaintiffs brought this action against the NYPD and the City of New York to recover overtime compensation to which they claim entitlement under the FLSA from April 19, 2001 to the present.[2]

Discovery commenced in July 2004 pursuant to a Joint Proposed Discovery Plan, which allowed plaintiffs to publicize their suit and seek joinder of additional plain-

---

1. See Declaration of Gregory K. McGillivary, Plaintiffs' Counsel, in Support of Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment on Liability ("McGillivary Decl.") ¶ 3.

2. See Complaint ("Compl.") ¶¶ 8–11.

tiffs until October 9, 2004.[3] The Plan also ordered the parties to "immediately commence initial discovery concerning the issue of whether plaintiffs are exempt from the FLSA's provisions."[4] Pursuant to a December 2004 Scheduling Order, the parties were directed to conduct discovery with respect to the job duties of sergeants employed by the NYPD.[5] In light of the large number of plaintiffs, the Court signed a Joint Stipulation and Order Regarding Test Plaintiffs in May 2005, which directed the parties to agree upon a method of identifying a limited number of deponents from sixteen job categories organized into three groups so that discovery with respect to each group could proceed according to staggered deadlines.[6]

On March 1, 2007, the parties informed the Court that discovery regarding the first group of test plaintiffs, comprising six job categories, had concluded.[7] Plaintiffs now move for partial summary judgment on the issue of defendants' liability with respect to this group. Defendants oppose on the ground that plaintiffs are exempted from the FLSA's overtime pay requirements because they are bona fide executives.

## B. First Group: Categories of Sergeants[8]

The first group of test plaintiffs[9] comprises six categories of sergeants from two departments.[10] The first department is the Housing Bureau, which includes the Patrol, Bike, and Anti–Crime units, as well as the Street Narcotics Enforcement Unit ("SNEU"). The second department is the Transportation Bureau, which includes the Highway Patrol and Mounted units. Pursuant to the May 2005 Joint Stipulation and Order, all sergeants have worked in the category for which they were selected for no less than six months during the time period covered by this action.[11]

### 1. Primary Duties of Sergeants

**3.** *See* 7/12/04 Joint Proposed Discovery Plan at ¶ 3(a) ("July 2004 Joint Discovery Plan"), Ex. 4 to McGillivary Decl.

**4.** *Id.* ¶ 3(b).

**5.** *See* 12/17/04 Scheduling Order at ¶ 1, Ex. 5 to McGillivary Decl.

**6.** *See* 5/5/05 Joint Stipulation and Order Regarding Test Plaintiffs ("May 2005 Joint Stip.") at ¶ 6, Ex. 6 to McGillivary Decl. The May 2005 Joint Stipulation and Order has been resubmitted and approved by the Court on three subsequent occasions, most recently on December 18, 2006. *See* McGillivary Decl. ¶ 4. *See also* 12/18/06 Joint Stipulation and Order Regarding Test Plaintiffs, Ex. 9 to McGillivary Decl. The parties agree that the May 2005 Joint Stip. erroneously states that there are seventeen job categories for which discovery will be conducted, but then properly lists sixteen categories. *See* May 2005 Joint Stip. at ¶ 6. *See also* 2/27/07 Letter from Robert S. Whitman, Defendants' counsel, to the Court, at 1 n. 1.

**7.** *See* 3/1/07 Pre–Motion Conference Transcript ("3/1/07 Tr.") at 12:20–25.

**8.** The facts set forth below are taken from Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("Pl.56.1"). Defendants' Statement Pursuant to Local Rule 56.1 ("Def.Resp.56.1"), Defendants' Statement of Material Facts as to Which Genuine Issues Exist ("Def. Counter 56.1"), and Plaintiffs' Response to Defendants' Statement Pursuant to Local Civil Rule 56.1, and any affidavits, declarations, and exhibits attached thereto. The following facts are undisputed unless otherwise noted.

**9.** For ease of reference, I refer to this first group of test plaintiffs as "plaintiffs" or "sergeants."

**10.** *See* Pl. 56.1 ¶¶ 5–6; May 2005 Joint Stip. ¶ 7.

**11.** *See* May 2005 Joint Stip. ¶ 6; Pl. 56.1 ¶ 6.

### a. General Duties[12]

The NYPD's Notice of Examination announces the administration of the civil service examination for promotion to sergeant and sets forth a "brief description of what [one] might do in this position [of sergeant] and does not include all the duties of this position."[13] While not exhaustive, the Notice of Examination states that "[s]ergeants, under the general supervision of a higher ranking officer, are responsible for the supervision of subordinates; instruct and counsel subordinates in their duties; . . . supervise police activity at the operational level and evaluate the quality of subordinates' performance. . . ."[14] Further, sergeants are responsible for performance of certain "physical activities," including but not limited to "working outdoors in all kinds of weather; walking and/or standing in an assigned area during a tour; . . . running after a fleeing suspect . . . [and] engaging in hand to hand struggles to subdue a suspect resisting arrest. . . ."[15]

While their specific duties vary according to unit, sergeants are generally involved in activities that include pursuing, restraining, and apprehending suspects.[16] Sergeants interview witnesses, suspects, victims, and vehicle operators.[17] They are dispatched to all arrests in their unit and must respond when directly dispatched.[18] Sergeants are responsible for verifying whether probable cause to arrest a suspect exists.[19] They also verify the target location for search warrants and determine whether a warrant is appropriate based on their judgment and evaluation as to the existence of probable cause.[20] Sergeants secure and determine the size and scope of a crime scene prior to the arrival of the Crime Scene Unit.[21] Sergeants also make the determination as to whether a show-up or line-up identification procedure may be conducted under the circumstances.[22]

Sergeants are specifically tasked with handling certain situations, including incidents that police officers identify as unusual or serious, instances where a firearm has been discharged, felonies, towing incidents, and calls that have occupied officers for more than thirty minutes.[23] Sergeants are dispatched and required to respond when situations involving emotionally disturbed individuals arise, as police officers are not permitted to take such people into custody.[24] In handling suspects, sergeants are authorized to use certain restraining devices that are not available to police officers.[25] These include but are not limited to tasers, water cannons, and restraining tape.[26]

---

12. Because the majority of the facts set forth by the parties are not unit-specific, the following facts are deemed to apply across all six categories that comprise the first group.

13. Notice of Examination, Promotion to Sergeant, NYCPD ("Notice of Exam") at 1, Ex. A to Answer to the Amended Complaint ("Answer").

14. *Id.*

15. *Id.*

16. *See* Pl. 56.1 ¶ 18.

17. *See id.* ¶ 20.

18. *See id.* ¶¶ 34, 37.

19. *See id.* ¶ 34.

20. *See id.* ¶¶ 34, 39; Def. Counter 56.1 ¶ 19.

21. *See Def.* Counter 56.1 ¶ 20.

22. *See id.* ¶ 21.

23. *See id.*

24. *See* Pl. 56.1 ¶ 38; Def. Counter 56.1 ¶ 17.

25. *See* Pl. 56.1 ¶ 41; Def. Counter 56.1 ¶ 18.

26. *See* Pl. 56.1 ¶ 41.

Sergeants confer with commanding officers regarding trends that they have observed and other matters of concern.[27] When there is an unusual or emergency situation, sergeants have the discretionary authority to initiate "Level One" mobilizations, which are designed to rapidly mobilize police personnel to the scene.[28] Moreover, sergeants determine when it is appropriate to retreat from a crime scene,[29] and they direct police officers to resume patrol when their services are no longer needed.[30] Similarly, sergeants can decide to direct a line-up change or reallocate and reassign police officers depending on the circumstances of the tour.[31]

Sergeants are responsible for completing unusual occurrence reports, which provide the written details of a significant or unusual occurrence that has arisen.[32] They are also required to complete reports that provide details of any car chase.[33] Additionally, sergeants review evidence vouchers and review and verify complaint reports, stop-and-frisk reports, and arrest reports.[34] They also testify in criminal court hearings regarding their law enforcement activities, with varying degrees of frequency.[35]

Sergeants' responsibilities vis-à-vis police officers include but are not limited to guiding and instructing subordinates on proper police procedures,[36] directing subordinates to canvas certain areas,[37] inspecting a unit's members to ensure use of proper equipment,[38] verifying officers' inspection of vehicles where applicable and directing the correction of deficiencies,[39] and inspecting patrol officers' memo books to ensure accurate recording of daily activities.[40] Sergeants make arrests and search suspects themselves,[41] and also direct patrol officers to make arrests, remove contraband from suspects or prisoners, and conduct searches.[42] When a sergeant directs others to conduct searches of suspects, she oversees the search to ensure safety and tactical correctness.[43] Performance reviews indicate that individual sergeants have been positively evaluated for

---

27. *See id.* ¶ 5.

28. *See* Def. Counter 56.1 ¶ 22.

29. *See id.* ¶ 23.

30. *See id.* ¶ 8.

31. *See id.* ¶ 32.

32. *See* Pl. 56.1 ¶¶ 21, 23; Def. Resp. 56.1 ¶ 21.

33. *See* Pl. 56.1 ¶ 24.

34. *See id.* ¶ 21; Def. Resp. 56.1 ¶ 21; Def. Counter 56.1 ¶ 36.

35. *See* Pl. 56.1 ¶ 25. *See also* 10/24/05 Deposition Testimony of Christopher Lagrasta—Anti–Crime Unit ("Lagrasta Dep.") at 162:16–23, Ex. to Declarations in Support of Plaintiffs' Motion for Partial Summary Judgment on Liability ("Pl.App.") (stating that he testified in criminal proceedings as a sergeant in the Anti–Crime unit over one hundred times); 6/7/06 Deposition Testimony of John Patane—SNEU Unit at 86:17–24, Ex. to PL App. (stat-

ing that he testified as a SNEU sergeant in criminal proceedings at least ten times).

36. *See* Def. Counter 56.1 ¶ 35.

37. *See id.* ¶ 16. *See also* 11/7/05 Deposition Testimony of Carolyn Phillpotts—Housing Patrol Unit at 117:12–14, Ex. S to Defendants' Appendix of Materials in Opposition to Plaintiffs' Motion for Summary Judgment on Liability ("Def.App.").

38. *See Def.* Counter 56.1 ¶ 35.

39. *See* Pl.56.1 ¶ 45.

40. *See* Def. Counter 56.1 ¶ 48.

41. *See* 5/24/06 Deposition Testimony of David Eggers—SNEU ("Eggers Dep.") at 36:9–36:21, Ex. I to Def.App.

42. *See* Lagrasta Dep. at 144:4–12.

43. *See* Eggers Dep. at 36:22–37:8.

being a "good role model to subordinates," a "highly motivated supervisor," for being "good at allocating personnel," and "present[ing] a positive supervisory image."[44]

Sergeants are also responsible for taking charge of a crime scene if they are the highest ranking officer present, and this entails directing other officers and ensuring that they are performing their jobs.[45] When a sergeant issues a lawful order to a subordinate, the order must be obeyed even if the subordinate has more experience and seniority than the sergeant or is outside the sergeant's unit.[46]

Sergeants "are responsible for subordinates' general appearance, punctuality, attendance, productivity, good order and discipline . . . ."[47] Pursuant to the NYPD Patrol Guide, patrol supervisors (a term commonly used to refer to sergeants)[48] are tasked with "visit[ing] various locations within command at different times during the first platoon to ascertain that uniformed members of the service are performing duty at all times."[49] Sergeants are also responsible for "visit[ing] police officers assigned to foot and radio motor patrol frequently and at irregular intervals during tour and indicat[ing the] visit by

signing the activity log of each member."[50] Additionally, every sergeant and lieutenant for each platoon is responsible for aiding the commanding officer in the enforcement of the holiday integrity program, which entails ensuring that police officers are not shopping while on duty or accepting gifts.[51]

Daily assignments for individual members of the NYPD, including sergeants, are made by lieutenants or higher-ranking officers, and are preprinted on roll call forms.[52] When filling in for a lieutenant as the desk officer, a sergeant may adjust the roll call in light of changed circumstances such as an officer's unexpected absence.[53] At other times, sergeants may also make adjustments to the roll call based on the circumstances and after conferring with the lieutenant if he or she is present.[54]

Subordinates submit Monthly Performance Reports to their sergeants, which detail the officer's activity during the preceding month.[55] Sergeants are responsible for reviewing these reports and for submitting them to the commanding officer with accompanying figures.[56] When a subordinate has been derelict in his duties, a sergeant has the authority to report such dereliction to the commanding officer.[57]

---

44. Def. Counter 56.1 ¶¶ 78–80.

45. *See id.* ¶ 21.

46. *See id.* ¶¶ 14–15, 61.

47. Notice of Exam at 1.

48. *See* Def. Counter 56.1 ¶ 4.

49. Patrol Guide—Patrol Supervisor: Procedure No. 202–17 ("Patrol Sup. Proced.") at ¶ 6, Ex. EE to Def.App.

50. *Id.* at ¶ 12. *See also* Def. Counter 56.1 ¶ 50.

51. *See* 3/12/06 Deposition of James McNamara—Housing Bureau at 56:8–57:6, Ex. O to Def.App.

52. *See* Pl. 56.1 ¶ 55.

53. *See, e.g.,* 11/07/05 Deposition Testimony of Anthony T. Russo—Mounted Unit at 80:19–81:25, Ex. U to Def.App.

54. *See id.* (testifying that, as sergeant, he would cross out an assignment on the roll call if an officer was sick and absent, and then inform the lieutenant so that the assignment could be covered).

55. *See* Def. Counter 56.1 ¶ 51.

56. *See id.* ¶ 52.

57. *See id.* ¶ 30. *See also* Patrol Sup. Proced. ¶ 16.

Pursuant to the Patrol Guide, sergeants must prepare a "Supervisor's Complaint Report/Command Discipline Election Report" and subsequently submit the report to the commanding officer of the subject officer.[58] Upon receipt of such report, the commanding officer is required to launch an investigation into the allegations at issue to determine whether a command discipline is warranted, and may confer with the supervisor who prepared the report, if deemed necessary.[59] In instances where a sergeant observes a subordinate who appears intoxicated, the sergeant must notify the precinct commander or duty captain immediately, and must direct the officer to remain at that location pending the arrival of the superior officer.[60]

Certain sergeants considered themselves responsible for ensuring that their patrol officers performed their assigned tasks.[61] Moreover, sergeants testified that they could be held accountable if their subordinates did not work; for example, they could be issued a command discipline for failure to supervise.[62]

### b. Unit–Specific Duties

The Patrol unit of the Housing Bureau must police the areas within and around public housing properties to provide a safe environment for the community through law enforcement.[63] Housing Patrol sergeants are required to be out in the field on patrol with their unit throughout each shift, and spend the majority of their tours doing so.[64] The NYPD uses vertical patrols to suppress criminal activity within a housing unit.[65] Sergeants have assigned police officers to conduct verticals with them,[66] although the decision whether to conduct a vertical usually resides with the commanding officer or the duty captain.[67] The commanding officer is also responsible for preparing written directives to assist patrol officers and sergeants regarding the frequency and location of assignments when there are civilian complaints of criminal activity.[68] Lieutenants in the Housing Bureau also perform supervisory oversight, including deciding whether units should be directed to certain crime conditions that have arisen.[69]

The Bike unit is a part of the Housing Bureau and is primarily tasked with patrolling housing developments for suspicious activity.[70] Based upon particular

---

**58.** *See* Patrol Guide—Reporting Violations Observed by Supervisors: Procedure No. 206–01 at ¶¶ 1–5, Ex. EE to Def.App.

**59.** *See* Patrol Guide—Command Discipline: Procedure No. 206–02 at 1–3, Ex. FF to Def. App.

**60.** *See* Pl. 56.1 ¶ 47. *See also* Patrol Guide— Removal of Firearms from Intoxicated Uniformed Member of the Service: Procedure No. 206–12 at 1, Ex. 1 to Pl.App.

**61.** *See* Def. Counter 56.1 ¶ 4. *See also* 11/15/05 Deposition Testimony of Richard Vetrano—Anti–Crime Unit at 135:2–12, Ex. to PL App.; 3/16/06 Deposition Testimony of Sean O'Keeffe–Bike Unit ("O'Keeffe Dep.") at 78:9–23, Ex. Q to Def App.

**62.** *See, e.g.,* O'Keeffe Dep. at 78:9–23.

**63.** *See* Pl. 56.1 ¶ 2.

**64.** *See id.* ¶ 9.

**65.** *See id.* (vertical patrols are "inspections throughout the inside of public areas in public housing facilities for purposes of suppressing criminal activity").

**66.** *See* Deposition Testimony of Keith Cooney—Housing Patrol Unit at 161:24–162:21, Ex. F to Def.App.

**67.** *See id.* at 162.

**68.** *See* PL 56.1 ¶ 59.

**69.** *See id.* ¶ 60.

**70.** *See id.* ¶ 60.

needs during a shift, a captain may direct the Bike unit to patrol a certain housing development.[71] Sergeants in the Bike unit utilize hand signals to position officers on bicycles in the field for law enforcement operations.[72]

The Anti–Crime unit is also a part of the Housing Bureau and is responsible for patrolling areas with a propensity for violent crime.[73] Anti–Crime sergeants spend the majority of their shifts in the field alongside police officers, and occasionally conduct vertical patrols with their teams.[74] One Special Operations lieutenant holds overall supervisory responsibility over the Anti–Crime unit.[75] The memo book of Sergeant Christopher Connolly reflects that, as an Anti–Crime sergeant, he participated in and verified at least one hundred and sixty-four arrests and conducted at least three verticals, in addition to other law enforcement activities, during a period approximating one year and five months.[76]

Certain Anti–Crime units perform Street Narcotics Enforcement Unit activities aimed at deterring the sale of narcotics on the streets around public housing properties.[77] SNEU sergeants spend most of their shift in the field, where they act as observation posts, relaying information to team members who then apprehend and arrest individuals observed selling narcotics.[78] Sergeants also verify field testing of marijuana and secure narcotics evidence.[79] As a sergeant in the SNEU, Sergeant Martin Stiastny participated in and verified at least one hundred and fourteen arrests, conducted at least forty-five verticals, transported prisoners at least fifty-five times, wrote at least twelve tickets and was involved in capturing persons subject to warrants during an approximately five month period.[80] Generally, Anti–Crime sergeants do not need permission from the special operations lieutenant before they return from the field to the station house.[81]

Housing Bureau sergeants, particularly those in the SNEU and the Anti–Crime unit, have tactical meetings with their assigned patrol officers to discuss issues such as target locations and officers' assignments.[82] In both units, sergeants are responsible for assigning team members specific duties during operations and selecting target locations for a particular tour, as well as the order in which to address each target.[83] During an actual SNEU operation, the sergeant directs the team's law enforcement activities.[84] Without a sergeant present, patrol officers in SNEU and Anti–Crime are not permitted to conduct a plainclothes operation.[85]

71. *See id.*

72. *See id.* ¶ 46.

73. *See id.* ¶ 11.

74. *See id.*

75. *See* Def. Counter 56.1 ¶ 61.

76. *See id.* ¶ 16; Summary of Memo Books, Ex. 13 to Pl.App.

77. *See* Pl. 56.1 ¶ 12.

78. *See id.*

79. *See id.* ¶ 19.

80. *See id.* ¶ 16; Summary of Memo Books, Ex. 13 to Pl.App.

81. *See* 10/3/06 Deposition Testimony of Christopher Connolly—Anti–Crime Unit at 45:3–20, Ex. E to Def.App.

82. *See* Def. Counter 56.1 ¶ 38.

83. *See id.* ¶ 67.

84. *See id.* ¶ 39.

85. *See id.* ¶ 68.

The Highway unit of the Transportation Bureau patrols highways in order to ensure the safety of motorists on the highways, maintain the orderly flow of traffic, and respond to serious vehicle and pedestrian accidents.[86] The unit also provides escorts for large scale events and for the protection of dignitaries visiting New York City.[87] The Patrol arm of the Highway unit conducts general law enforcement activities on the highways, and Patrol sergeants spend the majority of their tours in the field.[88] The Commanding Officer in this unit bears ultimate responsibility for personnel, activity (i.e., number of summons issued and arrests made), and discipline.[89] Highway Patrol sergeants respond to all highway traffic incidents involving diplomatic immunity, verify the immunity, and then notify the captain if it has been verified.[90] Additionally, sergeants are required to respond to major accidents, and must follow up on accidents involving serious death or injury by ascertaining the victim's condition at the hospital and determining whether an accident investigation should be launched.[91] They are expected to spend the majority of their shifts out in the field, but may return to the station house based on the circumstances.[92]

Generally, sergeants in the Transportation Bureau observe patrol officers to ensure that traffic stops are conducted appropriately.[93] Sergeants may, at their discretion, order traffic checkpoints to aid in the search for intoxicated drivers and seatbelt violations.[94] In addition, sergeants have the discretion to authorize the establishment of roadblocks to aid in vehicle pursuit, or can decide to call off the pursuit altogether.[95]

The Mounted unit is also a part of the Transportation Bureau. Officers and sergeants patrol while mounted on horseback and are tasked with ensuring pedestrian safety, supplying crowd control, and creating a visible police presence in dense pedestrian areas including beaches, public parks, and tourist areas.[96] The unit comprises five troops, each commanded by a lieutenant who serves as platoon commander.[97] Mounted lieutenants are responsible for ensuring that sergeants and officers are performing their job duties in the field.[98] Mounted unit sergeants and officers are assigned by their superiors to pre-determined geographic areas, with the officers patrolling areas located within a sergeant's designated patrol zone.[99] Sergeants direct the positioning of the unit's police officers for purposes of setting up crowd control formations.[100] Sergeants are also required to notify a veterinarian if a horse is believed to be ill.[101]

---

86. *See* Pl. 56.1 ¶ 3.

87. *See id.*

88. *See id.* ¶ 14.

89. *See id.* ¶ 64.

90. *See id.* ¶ 35.

91. *See id.*

92. *See* Def. Resp. 56.1 ¶ 58. *See also* 5/12/06 Deposition Testimony of Jonathan Taormina—Highway Patrol Unit at 162:24–163:16, Ex. Y to Def.App.

93. *See* Def. Counter 56.1 ¶ 40.

94. *See id.* ¶ 42.

95. *See id.* ¶ 43.

96. *See* Pl. 56.1 ¶ 4.

97. *See id.*

98. *See id.* ¶ 62.

99. *See id.* ¶ 13.

100. *See id.* ¶ 13.

101. *See id.* ¶ 39.

With respect to attire, sergeants are required to wear dark blue shirts, similar to that of police officers, when patrolling in uniform.[102] At all other times, sergeants must wear white uniform shirts.[103] Unlike a police officer's shirt, a sergeant's shirt, whether in blue or white, bears an insignia of rank in the form of gold chevron stripes on the sleeves.[104] Further distinctions between the uniform of a sergeant and that of a police officer include the gilt cap device and chinstrap on the sergeant's cap, and the thicker braid on the sergeant's trousers.[105] While the shields of both sergeants and police offices display their individual badge numbers as a means of identification,[106] a sergeant's shield is gold in color whereas police officers' shields are silver.[107]

Sergeants and police officers generally carry the same equipment in the field. In the Housing Patrol and Bike units, members of both ranks wear dark blue uniforms, helmets, and bulletproof vests, and carry guns, pepper spray, and radios.[108] Similarly, sergeants and police officers in the Mounted unit also patrol in dark blue uniforms, helmets, bulletproof vests, as well as riding boots and spurs.[109] Highway Patrol unit sergeants and police officers both wear dark blue uniforms, motorcycle boots, helmets, and britches.[110] Both ranks carry guns, pepper spray, handcuffs, and flashlights.[111] Anti–Crime and SNEU sergeants and police officers patrol in plainclothes and wear bulletproof vests and "color of the day" wristbands, which help police personnel identify one another.[112] Both ranks also carry guns, handcuffs, mace, and extra ammunition during these field tours.[113]

### 2. Authority to Hire/Fire or Suggestions Given Particular Weight

All police officers seeking the rank of sergeant must take a civil service examination.[114] The NYPD considers candidates' scores on this examination when determining which officers to promote.[115] Sergeants rate their patrol officers every quarter and issue points, which officers accumulate throughout the year and may use to facilitate a transfer to a desired

**102.** *See id.* ¶ 31. *See also* Interim Order— Dark Blue Uniform Shirts to Be Worn by Uniformed Members of the Service in the Rank of Sergeant ("Interim Uniform Order") at 1, Ex. 8 to Pl.App.

**103.** *See* Interim Uniform Order at 1 ("The white uniform shirt will continue to be worn by all uniformed members in the rank of sergeant at all other times."). *See also* Patrol Guide—Uniforms: Procedure No. 204–03 at 3 ("Uniform Procedure"), Ex. 1 to PL App.

**104.** *See* Uniform Procedure at 3. *See also* 11/7/05 Deposition Testimony of Thomas Burke—Mounted Unit at 169:8–10, Ex. C to Def.App. (testifying that a "Mounted sergeant wears gold chevrons, which are three stripes on the sleeve, and a Mounted patrol officer does not."). *Accord* 10/13/05 Deposition Testimony of Steven Green—Anti–Crime Unit ("Green Dep.") at 49:21–50:8, Ex. J to Def. App.

**105.** *See* Uniform Procedure at 3. *See also* Green Dep. at 51:14–21, 52:7–11.

**106.** *See* Pl. 56.1 ¶ 30.

**107.** *See* Uniform Procedure at 1–3. *See also* Green Dep. at 50:20–51:1.

**108.** *See* Pl. 56.1 26.

**109.** *See id.* ¶ 28.

**110.** *See id.* ¶ 29.

**111.** *See id.*

**112.** *See id.* ¶ 27 (the "color of the day" is not determined by a sergeant).

**113.** *See id.*

**114.** *See* Def. Counter 56.1 ¶ 1.

**115.** *See* Pl. 56.1 ¶ 50.

precinct, investigatory unit, or non-precinct assignment.[116] Sergeants are also required to complete annual performance evaluations of their officers,[117] and these evaluations contain ratings and an overall score.[118] These evaluations are also considered when an officer seeks to transfer to another precinct or unit.[119] When an officer receives a performance evaluation with certain low ratings, that evaluation is automatically referred to the NYPD's Performance Monitoring Program, and may affect that officer's chances for transfers and promotions.[120]

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[121] An issue of fact is genuine "'if the evi-

dence is such that a reasonable jury could return a verdict for the nonmoving party.'"[122] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[123] "It is the movant's burden to show that no genuine factual dispute exists."[124]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. Further, "where the non-moving party bears the burden of proof at trial ... it is its burden to come forward to demonstrate that there are issues that must be decided by a factfinder."[125] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[126] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[127] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at tri-

---

116. *See* Def. Counter 56.1 ¶ 54.

117. *See* Pl. 56.1 ¶ 49.

118. *See* Def. Counter 56.1 ¶ 73.

119. *See id.*

120. *See id.* ¶ 74.

121. Fed.R.Civ.P. 56(c).

122. *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.1998)).

123. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005)).

124. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

125. *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *See also In re September 11 Litigation*, 500 F.Supp.2d 356, 360–61 (S.D.N.Y.2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

126. *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

127. *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001)).

al.'" [128]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[129] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" [130] Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." [131]

While district courts may grant summary judgment *sua sponte*, they are "well advised to give clear and express notice before [doing so], even against parties who themselves moved for summary judgment. The provision of such notice requires relatively little time or effort." [132] In the absence of notice, the *sua sponte* grant of summary judgment will be reversed if the moving party was procedurally prejudiced as a result.[133] "If however, the party either cannot claim to have been surprised by the district court's action or if, notwithstanding its surprise, the party had no additional evidence to bring, it cannot plausibly argue that it was prejudiced by the lack of notice." [134] Moreover, the "threat of procedural prejudice is greatly diminished if the court's *sua sponte* determination is based on issues identical to those raised by the moving party." [135]

## B. Fair Labor Standards Act—Executive Exemption[136]

 Under the FLSA, an employee must be paid by his employer for work performed in excess of forty hours in a week "at a rate not less than one and one-half times the regular rate at which he is employed." [137] Exempted from this overtime pay requirement is "any employee employed in a bona fide executive, administrative, or professional capacity ... (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor])." [138] In April 2004, the Secretary of Labor exercised this "broad authority to define and delimit" [139] the

128. *McClellan,* 439 F.3d at 144 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

129. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 456 (2d Cir.2007) (citing *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir. 1997)).

130. *McClellan,* 439 F.3d at 144 (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

131. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir. 2000)).

132. *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 139–40 (2d Cir.2000).

133. *See id.*

134. *Id.*

135. *Id.* (quotation omitted).

136. Although the parties agree that defendants assert both the executive and administrative exemptions under the FLSA, the papers submitted by both parties almost exclusively address the application of the executive exemption. As a result, I will address only the executive exemption in this Opinion.

137. 29 U.S.C. § 207(a)(1).

138. *Id.* § 213(a)(1).

139. *Auer v. Robbins,* 519 U.S. 452, 456, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ("The FLSA grants the Secretary broad authority to define and delimit the scope of the exemption for

scope of the FLSA's exemptions and updated its regulations promulgated under the statute.[140] These revised regulations, which went into effect on August 23, 2004, define an exempt "executive" as any employee who is:

(1) [c]ompensated on a salary basis at a rate of not less than $455 per week; (2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[141]

"Job title alone is insufficient to establish the exempt status of an employee."[142]

Further, the employer bears the burden of invoking an exemption, which is "narrowly construed against the employers seeking to assert [it] and [its] application limited to those establishments plainly and unmistakably within their terms and spirit."[143]

### 1. Primary Duty[144]

"Primary duty," as used in the second prong of the above-stated test for executive exemption, is the work that is the "principal, main, major or most important duty that the employee performs."[145] The overtime regulations also define "management," which must constitute the employee's primary duty in order for her to be properly classified as an exempt executive. Management activities include but are not limited to "interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees [;] ...

---

executive, administrative, and professional employees.") (quotation omitted).

**140.** This 2004 update eliminated the regulations' previous "long test" and "short test" for determining whether an employee is an exempt executive. Under the "short test," an employee must: (1) earn $250 or more per week; (2) have management as her primary duty; and (3) regularly direct the work of two or more other employees. *See* 29 C.F.R. § 541.1(f). *See also Donovan v. Burger King Corp.*, 675 F.2d 516, 518 (2d Cir.1982). The "long test" only applied when an employee earned less than $250 per week. *See* 29 C.F.R. § 541.1(a)-(e). Among the reasons for the revisions in 2004 was to make the regulations "less confusing, complex, and outdated." *Moran v. GTL Constr., LLC*, No. 06 Civ. 168, 2007 WL 2142343, at *2 n. 1 (S.D.N.Y. July 24, 2007).

**141.** 29 C.F.R. § 541.100(a) (2004).

**142.** *Id.* § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part.").

**143.** *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir.2006) (citation omitted). *Accord Khan v. IBI Armored Servs., Inc.*, 474 F.Supp.2d 448, 456 (E.D.N.Y.2007) ("The burden to establish factually a statutory exemption from the FLSA never shifts from the employer."); *Jackson v. City of San Antonio*, No. SA–03–CA–0049, 2006 WL 2548545, at *4 (W.D.Tex. Aug.31, 2006) (" 'To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.' ") (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945)).

**144.** Because it is undisputed that plaintiffs are compensated on a salary basis of not less than $455 (or $250, under the pre–2004 "short test") per week, I turn to the duties prong of the test without further discussion of salary.

**145.** 29 C.F.R. § 541.700.

disciplining employees; planning the work[;] ... apportioning the work among the employees." [146]

In determining what constitutes an employee's primary duty, the regulations dictate that all facts must be considered, with "major emphasis" placed on the "character of the employee's job as a whole." [147] The following factors, though not exhaustive, are relevant to the "primary duty" inquiry:

[T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.[148]

While an employee who spends over fifty percent of her time on exempt duties "will generally satisfy the primary duty requirement," there is no threshold time requirement in the statute or regulations.[149] Where an employee concurrently performs both exempt and non-exempt duties, her status is "determined on a case-by-case" [150] inquiry into the above-stated factors. As a guiding principle, the regulations explain that "[g]enerally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for success or failure of business operations under their management while performing the nonexempt work." [151] In contrast, nonexempt employees are usually directed by a supervisor to perform exempt work or only do so for a defined period of time.[152]

The regulations go on to provide that the scope of the exemptions from overtime pay are not so broad as to cover:

police officers, detectives, deputy sheriffs ... and similar employees, regardless of rank or pay level, who perform work such as ... preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals ...; interviewing witnesses; interrogating and fingerprinting suspects; preparing investiga-

---

146. *Id.* § 541.102.

147. *Id.* § 541.700.

148. *Id. See also Auer v. Robbins,* 65 F.3d 702, 712 (8th Cir.1995) *aff'd,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

149. 29 C.F.R. § 541.700 ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."). *See also Jackson,* 2006 WL 2548545, at *9 ("There is no magic number or amount of time spent on activities at which an officer becomes an 'executive.' ").

150. 29 C.F.R. § 541.106(a).

151. *Id.*

152. *See id.* The regulations provide further guidance in the form of examples:

[A]n assistant manager [in a retail establishment] can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves. 29 C.F.R. § 541.106(b).
In contrast, a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable. 29 C.F.R. § 541.106(c).

tive reports; or other similar work.[153] This carve-out for first responders is justified on the grounds that "[s]uch employees" do not have management as their primary duty, and cannot therefore be properly considered exempt executives.[154] "Thus, for example, a police officer ... whose primary duty is to investigate crimes ... is not exempt ... merely because the police officer ... also directs the work of other employees in the conduct of an investigation ...."[155]

"The question of how the [plaintiffs] spent their working time ... is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law ...."[156] As such, summary judgment may be appropriate where the parties agree as to the duties performed, but disagree as to whether the nature of the duties is properly characterized as managerial.

### 2. Customary and Regular Direction of Two or More Employees

Under the third prong of the executive exemption test, an employee must "customarily and regularly direct the work of two or more other employees."[157] The regulations define "customary and regularly" as a "frequency that must be greater than occasional" but "may be less than constant."[158] Such work is performed "normally and recurrently" every work week, and excludes "isolated or one-time tasks."[159] The regulations further explain that the supervision over two or more full-time employees (or the equivalent) "can be distributed among two, three or more employees, but each such employee must customarily and regularly direct the work of two or more other full-time employees or the equivalent."[160]

### 3. Authority or Influence on Employment Status Decisions

The fourth and final prong of the executive exemption test requires an employee to have "the authority to hire or fire other employees" or to have "particular weight" accorded to her "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees."[161] With respect to the latter, the federal regulations set forth a non-exhaustive list of factors to consider when determining whether "particular weight" is given to an employee's suggestions and recommendations. Relevant to this inquiry is:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.[162]

The regulations further explain that the suggestions and recommendations made by the potentially exempt executive must be with respect to those employees she

153. *Id.* § 541.3.

154. *Id.*

155. *Id.*

156. *Icicle Seafoods, Inc. v. Worthington, et al.,* 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).

157. 29 C.F.R. § 541.100(a)(3).

158. *Id.* § 541.701.

159. *Id.*

160. *Id.* § 541.104.

161. *Id.* § 541.100(a)(4).

162. *Id.* § 541.105.

customarily and regularly directs under prong three of the test. While "an occasional suggestion with regard to the change in status of a co-worker" will not satisfy this prong, "an employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." [163]

## IV. DISCUSSION

As an initial matter, I recognize that the preamble to the Department of Labor's revised regulations, effective August 23, 2004, cites "police sergeants" as an example of first responders who "are entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management ...." [164] The Department of Labor, however, also makes clear that it has "no intention of departing from [ ] established case law." [165] Indeed, in its brief submitted as amicus curiae, the Secretary of Labor reiterates that, with regard to the inquiry into

whether an employee's primary duty is management, "the new regulations do not depart from the 'established case law' in which application of the duties test determines whether a given employee is exempt." [166] As such, courts continue to apply the primary duty test to sergeants' post-August 23, 2004 claims, and at least one court has concluded, applying that test, that sergeants are exempt executives, notwithstanding the preamble's reference to them as non-exempt. [167]

Plaintiffs concede that "both the new regulations and old regulations apply to [their] claims" but contend that "since the new regulations simply clarify the existing regulations ... and are not inconsistent with the old regulations, they are useful to consult and apply with respect to both the time period before they took effect as well as after." [168] While it is true that the pre-August 2004 regulations are not inconsistent with the "new" or revised (and current) regulations, I apply the "short-test" for executive exemption to the period prior to August 23, 2004 and apply the revised regulations to the period thereafter. [169]

163. *Id.*

164. 69 Fed.Reg. 22122–01, 22129. *See id.* ("Police sergeants, for example, are entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations ....").

165. *Id.*

166. Brief of the Secretary of Labor as Amicus in the Disposition of Plaintiffs' Motion for Summary Judgment ("SOL Amicus Brief") at 6.

167. *See Murphy, III v. Town of Natick*, 516 F.Supp.2d 153 No. 04 Civ. 11996, 2007 WL 2775088, at *3–4 (D.Mass. Sept.25, 2007) (holding that sergeants are exempt executives under both the pre–2004 and post–2004 feder-

al regulations without discussion of or deference to the preamble's reference to sergeants).

168. Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl.Mem.") at 10.

169. *See, e.g., Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, 2006 WL 2853971, at *2 n. 2 (S.D.N.Y. Oct.5, 2006) (noting that the "differences between the current regulations and those previously in effect will be relevant to the merits of plaintiffs' claims ...."); *Smith v. Heartland Auto. Servs.*, 404 F.Supp.2d 1144, 1148 n. 2 (D.Minn.2005) ("[M]embers of the purported class will have different legal standards applicable to them depending on whether they were [ ] managers only before August 23, 2004, or ... after that date as well.").

I now turn to defendants' contention that the motion at issue is "necessarily limited to those 21 witnesses who have presented testimony as to their specific facts and circumstances . . . ."[170] To adopt defendants' approach would undermine the purposes of economy and efficiency that underlie the May 2005 Joint Stipulation, in which the parties agreed to "use a random selection process to identify 89 deponents" from sixteen categories of sergeants and proceed with discovery with respect to those "test plaintiffs."[171]

Defendants, at this late juncture, take issue with a framework that has been in place for over two years on the ground that because "[n]o motion for conditional certification has ever been filed in this case," plaintiffs' motion "as filed cannot properly determine the exempt status of all sergeants even within those six categories . . . ."[172] Defendants' position is untenable. While it is true that no motion for conditional certification has been filed, plaintiffs are "not required to rely on court-facilitated notice to notify potential opt-in plaintiffs of the action."[173] As stated in the Complaint, plaintiffs have already given written consent to bring the instant suit,[174] and, moreover, the parties agreed that plaintiffs could have an opportunity to publicize their case and seek joinder of additional plaintiffs for a limited period, pursuant to the July 2004 Joint Discovery Plan.[175] Had defendants raised timely objections to the discovery framework, the Court might have exercised its discretion to address such issues at that time. In light of the late stage of this litigation, however, and the fact that defendants have long been aware of the purposes behind the random selection and designation of "test plaintiffs," their attempt to limit the instant motion to the twenty-one deponents is rejected.

## A. Primary Duty

■ Because the parties do not dispute that plaintiffs satisfy the salary requirement found in both the "short test" and the current test, the next question is whether plaintiffs' primary duty is management of the enterprise in which they are employed. This inquiry is a key component of both the "short-test" and the current test.[176]

"Deciding whether an employee is exempt must be a voyage through fact-bound waters. Although there are a great many stars of law to navigate by, the course turns on the facts of an employee's job duties."[177] Plaintiffs contend that a sergeant's primary duty is "policing—pure

---

**170.** Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Liability ("Def.Opp.") at 3.

**171.** May 2005 Joint Stip. ¶ 6.

**172.** Def. Opp. at 3.

**173.** *Taylor v. CompUSA, Inc.*, No. CIVA1:04CV718, 2004 WL 1660939, at *3 (N.D.Ga. June 29, 2004) (citation omitted). *Accord Garner v. G.D. Searle Pharms. & Co.*, 802 F.Supp. 418, 421 (M.D.Ala.1991) ("[Section] 216(b) [of the FLSA] does not require parties to obtain judicial approval before seeking to locate other 'similarly situated' persons . . . it is not the court's role to prohibit plaintiffs from attempting to gather these consents.").

**174.** *See* Compl. ¶ 2.

**175.** July 2004 Joint Discovery Plan ¶ 3(a).

**176.** *See* SOL Amicus Brief at 6 (stating that, with regard to the inquiry into whether one's primary duty is management, "the new regulations do not depart from the 'established case law' in which application of the duties test determines whether a given employee is exempt") (citation omitted).

**177.** *Harris v. District of Columbia*, 741 F.Supp. 254, 259 (D.D.C.1990).

law enforcement work on the front lines, albeit the most sophisticated work confronting the police in the field."[178] They argue that sergeants earn a higher salary and are higher-ranked than police officers not because they are engaged in management, but because they conduct "complex" or "sophisticated" law enforcement tasks such as restraining suspects using special devices.[179] Further, plaintiffs maintain that their primary and most time-consuming task is their field work alongside patrol officers. According to plaintiffs, minimal time is spent on supervisory tasks, and such supervision is only undertaken at the direction of their own superiors. Moreover, plaintiffs contend that they themselves are required to perform the same tasks that their subordinates are directed to perform.[180]

Defendants argue that plaintiffs attempt to "minimize their authority and downplay their responsibilities"[181] by holding themselves out to be mere enforcers of the law. Defendants do not dispute that sergeants perform law enforcement duties out in the field.[182] Rather, defendants contend that plaintiffs wrongly advance the argument "that they cannot be exempt because they perform many of the same duties as police officers . . . ."[183] According to defendants, plaintiffs' performance of law enforcement duties and their presence in the field do not preclude a finding of executive exemption, but instead bolster the argument that they are "front-line NYPD supervisor[s]"[184] who "'direct' and 'apportion' the work of police officers in the field."[185] In support, defendants point to provisions from official NYPD documents regarding sergeants' responsibilities, as well as testimony from sergeants and higher-ranking officers, to argue that sergeants are specifically tasked with instructing their subordinates and supervising their performance.[186] Moreover, the sergeants themselves are subject to discipline for their failure to do so.[187]

In their reply, plaintiffs contend that the parties essentially agree as to plaintiffs' job duties as sergeants, but dispute whether those duties satisfy the primary duty prong of the executive exemption test.[188] According to plaintiffs, because the nature of the dispute is legal rather than factual, summary judgment is appropriate. Upon a searching examination of the record, I find as a matter of law that plaintiffs' primary duty is management and therefore grant defendants summary judgment on the issue of liability as to the period governed by the "short test."[189]

---

178. Pl. Mem. at 3.

179. *See id.* at 15. *See also* Pl. 56.1 ¶ 41.

180. *See* Pl. Mem. at 3, 19.

181. Def. Opp. at 1.

182. *See id.* at 17.

183. *Id.*

184. Pl. Mem. at 8.

185. Def. Opp. at 10.

186. *See id.* at 9, 12–13.

187. *See id.*

188. *See* Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment on Liability ("Reply Mem.") at 1 ("Defendants admit that the dispute is not a factual one, but is instead a legal question . . . .").

189. The parties were on notice that the Court might grant summary judgment against plaintiffs, the moving party. Even if the Court's notice was not clear and express, plaintiffs cannot claim to have been surprised by the grant of summary judgment in favor of defendants where plaintiffs themselves indicated at a pre-motion conference that both parties intended to cross-move for summary judgment on the issue of liability. *See* 3/1/07 Tr. at 15:15–22 (Plaintiffs' counsel: "[W]e were go-

It is undisputed that plaintiffs perform law enforcement duties alongside patrol officers in the field. Plaintiffs offer deposition testimony indicating that their tasks include, but are not limited to: conducting interviews of witnesses, suspects and victims; responding to arrest dispatches out in the field; conducting verticals; transporting prisoners; writing tickets; capturing persons subject to warrants; conducting missing persons searches; and apprehending and arresting suspects.[190] While sergeants have unit-specific duties, they generally spend much of their time in the field with their subordinates.[191] Nevertheless, the fact that plaintiffs spend most of their shifts working alongside their subordinates and performing many of the same law enforcement tasks does not, in itself, dispose of the primary duty inquiry.[192] Indeed, courts have found parties to be exempt executives even when they spend up to ninety per-

cent of their time performing non-exempt tasks.[193] Courts must instead look to the "character of the [plaintiffs'] job as a whole" and determine what constitutes the "principal, main, major or most important duty" that plaintiffs perform.[194]

As delineated in the Patrol Guide and substantiated through extensive deposition testimony, plaintiffs are front-line supervisors of subordinate police officers and their primary duty is management. This determination accords with the majority of courts that have considered the status of sergeants as exempt executives, both prior to and following the revised federal regulations, and have reached the same conclusion.[195]

Plaintiffs have offered evidence demonstrating that much of their time is spent in the field. Nonetheless, courts have held the primary duty of sergeants is management notwithstanding their predominant field presence.[196] The undisputed facts re-

---

ing to cross-move at the same time ... that's what our proposal was, is whoever wants to file a motion for summary judgment[,] our motion would say [defendants] haven't met their exemption obligations, [defendants'] motion would say the opposite ...."). Thus, the parties clearly expected the Court to resolve the issue of defendants' liability, regardless of which party moved for summary judgment, or whether both parties cross-moved. Moreover, plaintiffs have not been procedurally prejudiced where it is highly unlikely that they had any additional evidence to bring, and where the Court's grant of summary judgments in favor of defendants is "based on issues identical to those raised" by plaintiffs' own motion. *Bridgeway*, 201 F.3d at 139–40.

190. *See* Pl. 56.1 ¶¶ 16, 20, 34, 37.

191. *See, e.g.,* Pl. 56.1 ¶ 9.

192. *See Raper v. State*, 688 N.W.2d 29, 39 (Iowa 2004) ("Although these sergeants emphasize the percentage of time they spend performing regular trooper duties as compared to the time they spend performing supervisory functions, this is not the determinative factor in the court's analysis.").

193. *See, e.g., Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113–14 (9th Cir.2001) (affirming lower court's grant of summary judgment for defendant on plaintiffs' FLSA claim where plaintiffs spent ninety percent of their time on non-exempt duties).

194. 29 C.F.R. § 541.700.

195. *See, e.g., White v. San Mateo County*, 37 Fed.Appx. 280, 282–84 (9th Cir.2002); *Auer*, 65 F.3d at 711–20; *Shockley v. City of Newport News*, 997 F.2d 18, 25–28 (4th Cir.1993); *Murphy*, 2007 WL 277508, at *3–5; *Clayton v. State of Oregon*, No. 88 Civ. 6223, 1990 WL 32088, at *2–3 (D.Or. Jan.4, 1990); *Raper*, 688 N.W.2d at 38–40.

196. *See, e.g., Shockley*, 997 F.2d at 27 (affirming lower court's determination that certain sergeants' primary duty is management, even when those sergeants spent a majority of their time in the field engaged in law enforcement activities). *Cf. Anderson v. City of Cleveland*, 90 F.Supp.2d 906, 920 (E.D.Tenn.2000) (holding plaintiffs to be exempt where they spent "very little time performing basic police work ... and when they work alongside their men,

veal that plaintiffs do not simply work alongside their subordinates, but concurrently hold "more responsibility over their units." [197] "Even while performing the non-exempt tasks alongside their subordinates, [p]laintiffs [are] simultaneously tasked with the responsibility of ensuring that [d]efendant[s'] policies [are] being carried out." [198] " '[T]heir accountability for everything that takes place under their command and their ability to exercise discretion sets them apart from inferior officers.' " [199]

Indeed, the parties do not dispute that defendants depend upon plaintiffs to exercise discretion and make significant decisions based on their judgment while in the field, including verifying whether probable cause to arrest a suspect exists,[200] determining whether a show-up identification procedure is justified,[201] making tactical decisions such as when to retreat from a crime scene,[202] directing subordinates to canvas a certain area,[203] positioning officers in the field for law enforcement oper-

ations,[204] and guiding subordinates on proper police procedures.[205] Because they customarily serve as the "ranking officers at any accident or arrest scene," [206] they are relatively free from direct supervision and can "make any of the spot decisions that [are] required, ensure that proper safety precautions [are] taken, and [ ] supervise, correct, train, and evaluate their officers." [207] In doing so, they "exercise a great deal of management and discretion" over the officers they accompany in the field.[208] The record also shows that plaintiffs are responsible for ensuring that their subordinates perform their assignments, and they are personally subject to discipline for failure to do so.[209]

The nature and relative importance of the "additional duties completely separate and distinct" from those plaintiffs share with their subordinates [210] indicate that plaintiffs' principal value to defendants is their service as "immediate supervisors in the chain of command" to whom subordinates look for "guidance and direction,"

it is in a backup or support capacity"); *Nickell v. City of Lawrence*, 352 F.Supp.2d 1147, 1160 (D.Kan.2004) (holding plaintiffs to be exempt where they "rarely work in the field alongside the officers they supervise").

197. *Shockley*, 997 F.2d at 27.

198. *Allen v. Dolgencorp, Inc.*, 513 F.Supp.2d 1215, 1226–27 (N.D.Ala.2007).

199. *Nickell*, 352 F.Supp.2d at 1160 (quoting *Anderson*, 90 F.Supp.2d at 920).

200. *See* Pl. 56.1 ¶ 34

201. *See id.* ¶ 21.

202. *See id.* ¶ 23.

203. *See* Def. Counter 56.1 ¶ 16.

204. *See* Pl. 56.1 ¶ 46.

205. *See* Def. Counter 56.1 ¶ 35.

206. *Raper,* 688 N.W.2d at 39.

207. *Shockley,* 997 F.2d at 27.

208. *Auer,* 65 F.3d at 716 (affirming lower court and determining that sergeants in certain divisions have primary duty of management where they exercise management and discretion over their subordinates in the field).

209. *See* Def. Counter 56.1 ¶ 4.

210. *Raper,* 688 N.W.2d at 38 (affirming lower court's holding that sergeants are exempt executives where their duties overlap with those of subordinates, but there are also distinct duties for which they are solely responsible). *Accord Allen,* 513 F.Supp.2d at 1226–27 ("While Plaintiffs could (and apparently did) perform many of the non-managerial roles of other employees … none of the other employees were authorized to perform Plaintiffs' role …. ").

particularly while in the field.[211] This conclusion is not altered or undermined by the fact that plaintiffs exercise their discretion within the guidelines established by the NYPD or their superior officers,[212] that their decisions may be overridden by their superiors,[213] or that their own performance is subject to direct oversight.[214] Indeed, "the presence of a hierarchical structure does not negate the supervisory nature of work performed at [each of the] various levels" of the police department.[215] Moreover, the difference in the rate of pay between a sergeant and a police officer bolsters the Court's conclusion because it tends to "show[ ] that the [NYPD] is paying [sergeants] for more than the value of basic patrol services." [216]

Finally, the parties do not dispute that plaintiffs "customarily and regularly direct the work of two or more other employees." [217] In light of the undisputed evidence found in the extensive record as well as the weight of the authority on this precise issue, I conclude that plaintiffs' primary duty is management and defendants are entitled to summary judgment on liability for the period governed by the "short test."

## B. Authority to Hire/Fire or Suggestions Given Particular Weight

■ Turning to the final prong of the current test for executive exemption, which only applies to plaintiffs' claim for the period following August 23, 2004, courts must assess whether plaintiffs have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." [218] Plaintiffs argue that they do not have the authority to hire or fire employees, and contend that police officer promotions to the rank of sergeant or higher office are based exclusively on their civil service examination performance.[219] According to plaintiffs, defendants are unable to establish that any of plaintiffs' evaluations of their subordinates lead to any "tangible employment action" or "significant changes in employment status, such as hiring, firing, failing to promote, reassignment with significantly different re-

**211.** *Raper,* 688 N.W.2d at 38.

**212.** *See, e.g., Allen,* 513 F.Supp.2d at 1226–27 ("The fact that [plaintiffs] were to exercise their discretion within the guidelines imposed by Defendant's operating policies does not necessarily undermine the importance of Plaintiffs' managerial duties to Defendant"); *Wright v. Monroe County, New York,* No. 05 Civ. 6268T, 2007 WL 1434793, at \*5 (W.D.N.Y. May 14, 2007) (rejecting as "unremarkable" plaintiff's contention that he lacked discretion or authority to make, alter or deviate from sheriff's department policies and rules and noting that "there is no requirement that an executive employee be a policymaker").

**213.** *See Nickell,* 352 F.Supp.2d at 1161 ("Just because Plaintiffs' decisions could be, and occasionally were, overridden, does not mean they were restricted or prohibited from making the decisions in the first place.").

**214.** *See id.* (stating that although sergeants are subject to the direct oversight of their superior officers, they are nonetheless considered to be exempt).

**215.** *Id.*

**216.** *Raper,* 688 N.W.2d at 39.

**217.** Pl. Mem. at 18; Def. Opp. at 14. To the extent there is a dispute, the parties' arguments on this prong are closely linked to their dispute regarding the primary duty prong. As such, I do not separately address this prong.

**218.** 29 C.F.R. § 541.100.

**219.** *See* Pl. Mem. at 20.

sponsibilities, or a decision causing a significant change in benefits."[220]

Defendants contend that plaintiffs "play a vital role in recommending changes in a patrol officer's employment status and regularly take actions and make decisions that have substantial impact on their subordinates' careers."[221] According to defendants, plaintiffs "issue or strongly influence the issuance of discipline, prepare quarterly and annual performance evaluations, and award career points and recommend awards."[222] Defendants contend that these performance evaluations and career points assist officers in securing transfers to desirable precincts or into investigative units.[223]

In response, plaintiffs argue that these career points are irrelevant because they are only used, if at all, towards lateral transfers, which they contend do not constitute "tangible employment actions."[224] Moreover, plaintiffs maintain that because an officer's passage of the civil service examination constitutes the most important and arguably exclusive factor in the promotion process, defendants' contention that sergeants have authority in the hiring, firing, or promotion process through their evaluations and point system is not convincing.[225]

The record is replete with genuine issues of material fact regarding this prong. While the parties agree that plaintiffs are required to prepare annual performance evaluations,[226] they dispute the import of those evaluations and their role in the promotion process. Additionally, the parties dispute whether an officer's score on the civil service examination constitutes the most significant (or exclusive) factor in determining her promotion. Plaintiffs offer deposition testimony from sergeants stating that promotions to lieutenant and sergeant are based almost exclusively on the score that a candidate receives on the civil service examination.[227] As such, plaintiffs argue that their performance evaluations and other measures of officers' performance play no role in the hiring, firing, or promotion process, nor are they accorded any particular weight. Defendants offer evidence that performance evaluations prepared by sergeants play a major role in deciding which candidates from a civil service promotion list will be promoted.[228] According to defendants' cited evidence, even high-scorers on the examination may be passed over in favor of lower-scorers where the former's performance evaluations are negative.[229] In light of the disputed issues of fact in the record, the Court cannot decide this prong as a matter of law. As a result, summary judgment on defendants' liability for the period following August 23, 2004 is denied.

## V. CONCLUSION

For the reasons set forth above, defendants are granted summary judgment on the issue of liability for the period beginning April 14, 2001 through August 23, 2004. Summary judgment on the issue of defendants' liability for the following period is denied because genuine issues of

---

**220.** 69 Fed.Reg. 22122–01, 22131.

**221.** Def. Opp. at 15.

**222.** *Id.*

**223.** *See id.*

**224.** *See* Reply Mem. at 7–8.

**225.** *See id.* at 8–9.

**226.** *See* Pl. 56.1 ¶ 49.

**227.** *See id.* ¶ 50.

**228.** *See* Def. Resp. 56.1 ¶ 50.

**229.** *See id.*

material fact remain in dispute. The Clerk of the Court is directed to close this motion [Document No. 57]. A conference is scheduled for December 3, 2007, at 4:30 p.m.

SO ORDERED.